Fred Lee Thomas BRIGGS and Arbee Coleman, Plaintiffs in Error,

v.

STATE of Tennessee, Defendant in Error.

Court of Criminal Appeals of Tennessee.

Sept. 4, 1973.

Certiorari Denied by Supreme Court Nov. 5, 1973.

———◆———

Hugh W. Stanton, Jr., Memphis, for plaintiff in error.

David M. Pack, Atty. Gen., Phillip W. Brooks, Asst. Atty. Gen., Nashville, Jesse C. Mason and Thomas E. Crawford, Asst. Dist. Attys. Gen., Memphis, for defendant in error.

## OPINION

OLIVER, Judge.

Represented in their trial and here by the Public Defender appointed by the court, Fred Lee Thomas Briggs and Arbee Coleman have perfected their appeals in the nature of a writ of error to this Court contesting their Shelby County Criminal Court convictions, on March 2, 1972, of murder committed in the perpetration of a robbery, for which they were sentenced to death.

Assigning Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 as his reason for doing so, on December 1, 1972 the Governor of Tennessee commuted the sentence of each of the defendants from death to imprisonment for 99 years, thus rendering moot their Assignments of Error attacking the constitutionality of their death sentences on the basis of *Furman*. The effect of the latter case was considered in Bowen v. State, Tenn., 488 S.W.2d 373, wherein the Supreme Court of this State held, *inter alia,* (1) that the sentence of imprisonment resulting from Executive commutation of the death sentence is given effect as if it had been originally imposed, (2) that the acceptance of commutation by the defendant is not essential to its effectiveness, and (3) that once the sentence has been commuted and the death penalty removed, the judgment is valid. So, since the defendants are no longer subject to the death penalty, and in contemplation of law their 99-year prison sentences are considered to have been their original sentences, the constitutional question regarding the death penalty no longer exists in their cases.

  The defendants direct their first and third Assignments of Error to the sufficiency of the evidence, insisting that it preponderates against the verdict of the jury and in favor of their innocence. The principles to which we must adhere in reviewing a record when such Assignments are advanced have been enunciated so very many times by our Supreme Court and this Court that they are now common knowledge in the legal profession. The jury's verdict of guilt, approved by the trial judge, strips the defendant of the presumption of innocence, with which the law clothed him throughout his trial, and he stands before this Court presumed to be guilty and he has the burden here of demonstrating that the evidence preponderates against the verdict and in favor of his innocence. The verdict so approved accredits the testimony of the prosecution witnesses and establishes the State's theory of the case. We may review the evidence only to determine whether it preponderates against the verdict, and in doing so we are required to take the verdict as having es-

tablished the credibility of the State's witnesses. The verdict may not be overturned on the facts unless the evidence clearly preponderates against it and in favor of the innocence of the accused. Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, 1 Tenn.Cr.App. 1, 425 S.W.2d 799; Hancock v. State, 1 Tenn.Cr.App. 116, 430 S.W.2d 892; Morelock v. State, 3 Tenn.Cr.App. 292, 460 S.W.2d 861; Chadwick v. State, 1 Tenn.Cr.App. 72, 429 S.W.2d 135; Phillips v. State, 2 Tenn.Cr.App. 609, 455 S.W.2d 637.

This rule governing appellate review of criminal convictions makes unnecessary and, indeed, inappropriate, any detailed discussion of the evidence pro and con. Hargrove v. State, 199 Tenn. 25, 28, 281 S.W.2d 692, 694; Morrison v. State, 217 Tenn. 374, 397 S.W.2d 826, 400 S.W.2d 237.

Except for their testimony apart from the jury during the preliminary inquiry conducted by the court with respect to their confessions, the defendants did not testify or present any evidence during their joint trial upon a joint indictment charging them with the murder of Glenn June Salmon in the perpetration of a robbery.

About 7:30 p. m. on Monday, August 2, 1971, the deceased Glenn June Salmon left Webb's Used Furniture Store, where he worked and lived, and went across the street to Lizzie Walker's Cafe to pay her for a meal he had eaten there the day before. He then visited in Ida Flood's home for a while and from there went to Mahalia Jackson's establishment where he purchased a can of beer and took it out in a brown paper sack. Shortly thereafter an unidentified man found the deceased (commonly known and referred to as Shorty) lying on the sidewalk in front of the furniture store and summoned the police. The deceased had been stabbed in the cheeks, arm, neck and chest and died from the latter wound. His pockets were turned inside out. The door to the furniture store was open, and the padlock and key were lying nearby. An unopened can of beer was in the gutter and a paper sack was on the sidewalk. The next day George Hughes, who lived near the furniture store, found the deceased's billfold and some papers in or beside his yard.

The defendants were arrested on August 4. After being advised concerning their constitutional rights, Briggs made three statements on August 4 and 5, and Coleman made two statements on August 5. In their respective statements, in which each said the other did the stabbing, the name of the co-defendant was lined out and replaced with the words "the other person" pursuant to the court's instruction. That is, in Briggs' statements "other person" or "this other person" was substituted for Coleman's name, and in Coleman's statements like words were substituted for Briggs' name. Thus, when the statements were read to the jury (but were not passed to the jury for examination for the obvious reason that the name of the co-defendant in each statement was only marked through and was not obliterated), the court instructed the jury that the statements could be considered only against their respective authors, and repeated the same instruction in his charge to the jury.

At the conclusion of the preliminary investigation respecting the confessions of the defendants, the court found and held that each of them made their respective confessions freely and voluntarily, without any coercion or abuse or mistreatment or intimidation or promises of any kind, after being fully advised concerning their constitutional rights in keeping with the *Miranda* mandate.

The determination of the trial judge as to the voluntariness of pre-trial custodial statements by the accused is conclusive on appeal unless the appellate court finds that the evidence touching those questions preponderates against the trial judge's findings. McGee v. State, 2 Tenn.Cr.App. 100, 451 S.W.2d 709; Mitchell v. State, 3 Tenn.Cr.App. 494, 501, 464 S.W.2d 307; Gordon v. State, Tenn.Cr.App., 478

S.W.2d 911; Beaver v. State, 217 Tenn. 447, 398 S.W.2d 261; Lloyd v. State, 223 Tenn. 1, 440 S.W.2d 797. Upon appeal, the defendant has the burden of showing that the evidence preponderated against such a finding by the trial judge. Mitchell v. State, supra; Gordon v. State, supra; Wooten v. State, 203 Tenn. 473, 314 S.W. 2d 1; Monts v. State, 218 Tenn. 31, 400 S.W.2d 722.

■ Although it appears that the defendants did not expressly waive their constitutional rights in the premises, this Court has held that a waiver may be inferred from the facts of the case, and that proof of an affirmative statement by the defendant to that effect is not essential. McGee v. State, supra. See also: Monts v. State, supra.

■ Upon this record we cannot say that the evidence preponderates against the finding of the trial court, or that it was error to admit the confessions of the defendants in evidence and permit them to be read to the jury. Accordingly, we overrule the defendants' Assignments complaining about admission of those statements.

■ We also overrule their Assignments complaining about substitution of the words "the other person" for the name of the other in their respective statements, for the reason that, as noted, none of the statements were submitted to the jury for examination, so that there was nothing before the jury showing to whom "the other person" referred in the defendants' confessions. But over and beyond that, as will be seen from a summary of their confessions hereinafter detailed, both defendants admitted their participation in the robbery—murder. This alone renders altogether groundless their complaints about substituting "the other person" in place of their names in their confessions.

■ There is no substance to the arguments of the defendants that admission in evidence of their confessions violated the *Bruton* rule which proscribes, generally, using one co-defendant's confession to implicate the other. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476. That rule is inapplicable where, as here, all of the jointly tried co-defendants confess. O'Neil v. State, 2 Tenn.Cr.App. 518, 455 S.W.2d 597.

The substance of Briggs' extra-judicial statements is that sometime after 9:00 p. m. while he was in the House of Sound Cafe, the other person (Coleman) approached him and said, "come on man, let's go make some money"; that he asked this person how, thinking he was referring to a burglary; that they then went outside and saw the deceased coming up the street "from Mahalia Jackson's way," drinking from a can of beer in a paper sack; that the other person said, "Come on Man, let's go check Shorty out"; that he replied the deceased had no money, but the other person said he did; that he grabbed the deceased as he passed Robinson's Club, but he got away; that after the deceased reached the furniture store and unlocked the door, the other person ran and grabbed him by the neck; that the deceased threw a can of Schlitz at the other person and fought back; that the other person swung his hand, which had a "flashin thing" in it; that when the deceased fell, he saw the other person had a dirk knife; that he got his hand cut while the other person was stabbing the deceased; that he went through the deceased's pockets, taking out a pack of Tareyton cigarettes which he later threw away; that the other person took the deceased's billfold, and they then ran into an alley and both looked through the billfold, which he identified, and, finding no money, threw it and some papers away; that the other person hid the knife in some bushes in front of a big house and said he would pick it up later, and they then went to the Blue Stallion; that he had known the deceased for about a year; that he did not know the deceased had been stabbed until he saw the other person wiping blood off of the knife in the alley and the other person said he did it because the deceased was fighting back too hard.

Coleman related in his extra-judicial statements that he was at the House of

Sound Cafe about 9:00 p. m. and suggested going to the Blue Stallion when the other person (Briggs) came in; that after stepping outside, seeing a man coming up the street with a can of beer in his hand, the other person said, "Let's take him off"; that they followed the man, and the other person hit him as he stood facing a door; that the man threw a beer can and hit him (Coleman); that the other person hit the man again; that the man fell and got up and he (Coleman) hit him; that the other person then grabbed the man and stabbed him with a dirk; that after the man fell to the sidewalk, "I stood up over the man, and watched for him as the other person took the man's money and wallet"; that they ran into an alley and the other person looked through the wallet and, finding no money, left it and the papers taken from it in the alley; that close to $3.00 was taken from the man, and the other person gave him $1.40 in change; that they then went to the Blue Stallion; that the other person somehow cut himself on the hand; that he had a knife himself but kept it in his belt; and that he told Michael Hawkins that he had a fight with a man, and that this was the man that was robbed and cut.

Betty Sue Harris testified that between 10:00 and 10:30 p. m. she was at her uncle's house and Briggs came there with his hand cut and bleeding and told her that he and another person were robbing a man, and that the other person started to stab the man and he tried to stop him and got cut; that she and her cousin Morris Harris left their uncle's home and went to the Blue Stallion Lounge, meeting Briggs again on the way; that at the Blue Stallion Coleman asked Briggs how he cut his hand and just laughed when Briggs made no reply.

Morris Harris testified that when he and Betty Harris met Briggs again after they left their uncle's house and started to the Blue Stallion, Betty asked Briggs how he cut his hand but he made no reply; and that he had previously signed a statement in which he said he heard Briggs tell Betty he cut his hand while robbing a man.

Michael Hawkins testified that Coleman, who was living with him and his mother, did not come home on the night of August 2; that the next day Coleman told him that he had gotten into a fight the night before and had cut a dude; that Coleman asked him where the steak knife was and then put his dirk and the steak knife in the pantry.

■ Unquestionably this record, including the defendants' confessions, fully warranted and amply sustains the verdict of the jury. The defendants have failed to carry their burden of demonstrating here that the evidence preponderates against the verdict of the jury and in favor of their innocence.

■ Another Assignment of the defendants assails the action of the trial judge in admitting, over objection, two photographs showing the body of the deceased lying on the sidewalk and the furniture store door padlock and key nearby. Those photographs corroborated and illustrated the testimony of the furniture store owner and officers as to the location and condition of the deceased's body and the lock and key, and were admissible to enable the jury to visualize the conditions and consider the State's theory that the deceased was attacked and killed as he was about to enter the store where he worked and lived. The law has long been settled in this State that the admissibility of photographs is a matter to be determined by the trial court in the exercise of his sound discretion. Palmer v. State, 1 Tenn.Cr. App. 223, 435 S.W.2d 128; Freshwater v. State, 2 Tenn.Cr.App. 314, 453 S.W.2d 446; Morelock v. State, supra. There is nothing in this record supporting the defendants' contention that these photographs prejudicially inflamed and corrupted the minds of the jury. The trial court did not err in admitting them.

■ Equally baseless is the defendants' contention that their convictions are void because, in returning their verdict, the jury

failed to specify the degree of homicide of which they found them guilty, as required by T.C.A. § 39–2404. The jury reported its verdict in the following language:

> "We, the jury, find the defendants, Fred Lee Thomas Briggs and Arbee Coleman guilty of murder in the perpetration of a robbery as charged in the first count of the indictment and fix their punishment at death by electrocution."

One of the statutory definitions of first degree murder is killing a person in the perpetration of or attempt to perpetrate a robbery. T.C.A. § 39–2402. The same contention urged upon us by the defendants in this case was rejected by the Supreme Court of Tennessee in Buchanan v. State, Tenn., 488 S.W.2d 724, wherein the Court said:

> "By simple logic it must be deduced that if murder perpetrated in the commission of a robbery and other enumerated kinds of murder are murder in the first degree and all other kinds of murder are murder in the second degree, then the jury's verdict of murder in the perpetration of a robbery is a verdict of murder in the first degree."

And in Woodruff et al. v. State, 164 Tenn. 530, 538, 51 S.W.2d 843, the Court said that murder committed in the perpetration of robbery is murder in the first degree.

In another unfounded Assignment Briggs charges the trial court erred in not defining "mitigating circumstances" in the charge to the jury. Of course, in urging this contention Briggs has in mind T.C.A. § 39–2406 which provides that upon conviction of murder in the first degree or as an accessory before the fact of such crime the punishment shall be death in the mode prescribed by law, "or the jury may, if they are of opinion that there are mitigating circumstances, fix the punishment at imprisonment in the penitentiary for life, or for some period over twenty (20) years."

In Woodruff et al. v. State, supra, the Court addressed the same question:

> "There is no legal definition, either statutory or judicial, of the phrase 'mitigating circumstances,' as used in the statutes relating to murder. A judicial definition would tend to limit its application, and perhaps for that reason this court has not undertaken it. Under the former practice, when juries were authorized to report mitigating circumstances in their verdicts, upon which the trial judge could impose imprisonment rather than death as punishment, the finding of mitigating circumstances was treated as amounting to a recommendation to mercy which might be regarded or rejected. Greer v. State, 62 Tenn. (3 Baxt.), 321, 324.

> "The case just cited states the practice followed under former statutes to refrain from advising juries what would amount to mitigating circumstances. The court said: 'In determining whether, in their opinion, there are mitigating circumstances, the jury are left entirely to their own discretion. They are not told by the Judge what would be mitigating circumstances. It would possibly be error for the Judge to attempt to do so, as this would be to limit the jury on this point to such circumstances as the Judge might indicate; whereas, the Statute leaves the matter to the jury without restriction.'

> "Upon this authority we think it was the duty of the trial judge to do no more than he did, advising the jury of the power vested in them by law to assess the punishment at confinement in the penitentiary if they found mitigating circumstances. To have said more would have probably been to the prejudice of the plaintiff in error, in view of the evidence in the case. No theory consistent with the evidence and the law could have been framed by the judge which would have been likely to benefit Woodruff."

Finally, the defendants contend the trial court erred in declaring witness Morris Harris to be hostile and permitting the State to lead him. The State sought to

have Harris declared a hostile witness, because in a signed statement and in two conversations with the Assistant District Attorney General he stated he heard Briggs tell Betty Harris that he cut his hand when Coleman stabbed the man while robbing him. On the witness stand Harris denied hearing Briggs make any statement about how he was cut. Apart from the jury, the court conducted a lengthy examination of this witness and found that he admitted making those out-of-court statements, that his memory was refreshed, and that he was of normal intelligence and had good retentive powers. When, before the jury, Harris again denied hearing Briggs make any such statement, the court ruled him to be a hostile witness and permitted the State to lead him. The State then proceeded to read the answers given by Harris to previous questioning, asking him if he gave such answers and if they were correct. He denied telling the police he heard Briggs say that his hand was cut when Coleman was stabbing a man while robbing him, but admitted that statement was in the signed transcript of his examination by the police and that he had twice affirmed the truth of that statement in conversations with the Assistant District Attorney General but said he was afraid to do so on the witness stand.

In Wilson v. Tranbarger, 218 Tenn. 208, 402 S.W.2d 449, the Court said:

" 'The general rule obtains in criminal as well as civil cases, that a party cannot impeach his own witness, but this is subject to the exception that where a party is compelled to call an indispensable witness, or a witness that is hostile taking the party by surprise, such witness may be impeached by the party calling him. * * * In such case the hostility may be shown by the witness himself or otherwise, and he then may be examined as to his contradictory statements; but the impeachment of one's own witness is limited to those cases where his testimony is in direct contradiction to his prior statements, and he cannot be impeached where he is merely reluctant to give testimony or unless the testimony is actually prejudicial.' Wharton's Criminal Evidence, Volume 1, Tenth Edition, Section 484A, page 1002; King v. State, 187 Tenn. 431, 215 S.W.2d 813 (1948); Turner v. State, 188 Tenn. 312, 219 S.W.2d 188 (1949)."

The examination of unwilling or hostile witnesses is discussed in 98 C.J.S. Witnesses § 333:

"Usually leading questions, may be put to an unwilling or reluctant, evasive, unfriendly, hostile, or adverse witness. Whether or not such questions in such circumstances should be permitted is frequently held to be a matter for the sound discretion of the court, and whether a particular witness is so unwilling or hostile as to justify such questions to be put to him is a question for the court to determine, although if its determination in this respect is not in accordance with the facts, permitting a leading question to a witness not actually hostile is error.

\* \* \* \* \* \*

"It is also proper to allow such questions where the party introducing the witness is surprised by answers given by him, as where such answers are not in accordance with, or contradict, other statements theretofore made by the witness. Even though a witness is unwilling, a leading question would be objectionable, however, if it calls for testimony that is otherwise improper. It is not improper for the court to refuse to allow a leading question to be put to a party's own witness for the alleged purpose of showing his bias."

Upon consideration of the facts and circumstances related above concerning the witness in question, we are of opinion and hold that the trial court did not abuse his discretion in declaring the witness hostile and permitting the State to ask him leading questions.

Let the judgment of the trial court be affirmed.

GALBREATH and DWYER, JJ., concur.