STATE of Tennessee, Plaintiff-Appellee,

v.

Stephen Leon WILLIAMS,
Defendant-Appellant.

Supreme Court of Tennessee,
at Knoxville.

May 20, 1985.

518

Jerry W. Laughlin, Greeneville, David L. Brand, Church Hill, for defendant-appellant.

Wayne Uhl, Asst. Atty. Gen., Nashville, for plaintiff-appellee; William M. Leech, Jr., Atty. Gen., Nashville, of counsel.

## OPINION

BROCK, Justice.

The defendant, Stephen Leon Williams, was convicted of first degree murder and sentenced to death by electrocution for the killing of James E. Grizzle on or about January 12, 1981.

The victim, James Grizzle, a middle-aged man, apparently had saved some money while employed by a steel company in Indiana and he purchased an old house located near the Holston River in Hawkins County. He set about to remodel the two-story dwelling house and engaged the defendant, Stephen Leon Williams, to assist him in that work. As the remodeling work progressed, these two men lived on the premises, Williams upstairs and the victim, Grizzle, downstairs. Approximately between the hours of 1:00 a.m. and 2:00 a.m. on Thursday, January 15, 1981, the house was totally destroyed by fire. Earlier, at about 10:00 p.m., on the same night neighbors heard an explosion at the house. Firefighting authorities came to the scene but were unable to halt the fire.

When the victim's father did not hear from his son at the end of the week, as was customary, he alerted the police. Police officers called in arson experts and a forensic anthropologist from the University of Tennessee at Knoxville to aid in investigating the debris left from the fire. This investigation disclosed that a liquid accelerant had been used which had caused the fire to reach temperatures exceeding 2,000° Fahrenheit. The forensic anthropologist found a badly burned human skeleton in the debris downstairs; the upper torso and head had been severed from the remainder of the body and lay several feet away from the lower portion of the body. These skeleton remains matched Mr. Grizzle's physique and age and the teeth were consistent with his dental records.

The investigation by the law enforcement officers disclosed that, beginning on the Tuesday next before the fire on Thursday, the defendant Williams had begun to sell or trade various articles of the victim's property, viz., some carpet, a van and a dump truck. He told one person that the van belonged to a man down on the river who no longer needed it. He cashed two checks, totalling $1,400.00, written on the victim Grizzle's Virginia bank account and the evidence indicated that these checks were forgeries; in fact, defendant Williams told his girl friend, Barbara Wilson, that he had forged Grizzle's signature on them. The defendant also gave away Mr. Grizzle's suitcase and clothing which it contained.

The officers' investigation also revealed that on Tuesday evening James Moffit, a Kingsport police detective, was visiting a friend who lived near the home of defendant Williams when the detective received a telephone call from the defendant who said that he would "talk with" the detective if the latter would put down his gun. This, the detective refused to do, but shortly thereafter as the detective was leaving the home of his friend he was confronted by the defendant Williams who was armed with a rifle and who again demanded that the detective put down his gun. Detective Moffit refused that demand and threatened to call police headquarters for assistance if Williams continued the confrontation. At this point the defendant Williams left the scene.

Later on that same Tuesday night the defendant was arrested at a restaurant in Kingsport at which time he had on his person three pistols. On the next morning, Wednesday, the defendant told his bondsman that he needed to get out "pretty quick" because "he had something he had to take care of." The bondsman testified that Williams was nervous, upset and vomiting when he saw him that morning.

When asked where the victim, Mr. Grizzle, was, the defendant Williams told one story about how he had gone to Florida and another about his having left for Ohio. Later he told his girl friend, Barbara Wilson, that, although he had been at the house on the night of the killing, he did not do the killing but that Grizzle's "relatives" had done it. He told her also that Grizzle

had been shot four times and that the weapon had been thrown into the river.

The defendant was released on bail after his arrest for the murder but he fled to Cincinnati, Ohio, when he read in a newspaper that parts of the victim's body had been found and sent to a laboratory at the University of Tennessee at Knoxville for identification.

Defendant Williams was tried with Tony Flynn, a non-testifying co-defendant, who was acquitted by the jury. Certain of Flynn's statements to officers and others were highly incriminating of defendant Williams but were redacted and admitted into evidence. The redacted version of Flynn's statements indicated that a man had been murdered in a house down on the river; that an explosion had so badly scattered the corpse that Flynn could not remove the body from the house; that the house "smelled like a meat packing plant"; that Doberman pinscher hounds had been brought into the house but would not touch the human flesh. After the fire had destroyed the house in the early morning hours on Thursday, Flynn told a witness that the evidence was destroyed and that the victim's van had been taken out of state.

The defendant presented no proof of any kind.

## I. GUILT PHASE

### (a)

■ The defendant argues that the evidence is insufficient to support his conviction; we conclude otherwise. Although the evidence in this case is mostly circumstantial and was presented in a very fragmented manner, we conclude that a reasonable trier of fact could find that the defendant committed the offense of first degree murder beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Melson*, Tenn., 638 S.W.2d 342 (1982); Rule 13(e), Tennessee Rules of Appellate Procedure.

A jail mate of the defendant, William Douglas Helton, testified that he overheard the defendant state to Julius Hollifield, another inmate, that he had shot the deceased while attempting "to rob" him: "I shot him because I got caught at it, didn't want to get caught at it" and "he went in there to rob him and then he got into an argument over the robbery."

The defendant's girl friend, Barbara Wilson, testified that he told her that he was present when Mr. Grizzle had been killed by some members of the Grizzle family; she also testified that the defendant told her that the victim had been shot only four, not seven times, explaining, "you can't shoot a person seven times; it would take two guns, a gun only shoots six bullets." Moreover, he told her that the murder weapon would never be found, that it was in the river.

The witness Helton testified that the defendant told him that he blew up the body of the victim to get rid of it and that he "jumped" bond and went to Cincinnati, Ohio, when he heard that parts of the victim's body had been found and sent to a laboratory at the University of Tennessee in Knoxville.

Other evidence indicates that shortly following Mr. Grizzle's death the defendant depleted the victim's bank account by means of forged checks and that the defendant also sold the victim's van and dump truck.

We conclude that the evidence was sufficient, measured by the authorities above cited.

### (b)

Next, the defendant urges error in the failure of the trial court to sever his trial from that of co-defendant, Flynn. The prosecution had in its possession and introduced into evidence several statements made by Flynn. These statements strongly implicated defendant in the murder. The trial judge elected to follow the procedure outlined in Rule 14(c)(1)(ii), Tennessee Rules of Criminal Procedure, by deleting from Flynn's statements all references to the defendant Williams and allowing the

statements, as thus altered, to be admitted into evidence.

The defendant's primary complaint in this regard concerns the redaction and subsequent introduction into evidence of an oral statement allegedly made by co-defendant Flynn to his friend, the witness, John Frazier. In pertinent part, Rule 14(c)(1)(ii) is as follows:

"If a defendant moves for a severance because an out of court statement of a co-defendant makes reference to him but is not admissible against him, the court shall determine whether the state intends to offer the statement in evidence at trial. If so, the court shall require the prosecuting attorney to elect one of the following courses:

\* \* \* \* \* \*

"(ii) A joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been deleted, if, as deleted, the confession will not prejudice the moving defendant; and ...."

■ It is clear from the record that the trial court did redact from the statement in question all references to defendant Williams but the defendant argues, nonetheless, that even with the deletions, the oral statement of co-defendant Flynn was prejudicial to defendant Williams, in that, it rendered too hazardous the effort of defendant Williams' attorney to cross-examine the witness Frazier. He argues that cross-examination might have elicited from the witness, inadvertently, a response that would bring out incriminating matters that the court had attempted to excise. Our review of the record discloses that Frazier's testimony did not implicate appellant Williams and that Frazier was clearly aware of the limitations placed upon his testimony by the trial judge. Thus, this claim of error is denied.[1]

### (c)

Defendant Williams also complains that certain prospective jurors who expressed reservations respecting the imposition of the death penalty were improperly excused by the court during voir dire. Defendant complains, primarily, of the dismissal of prospective juror Mrs. Willis whose voir dire, in pertinent part, was as follows:

"The Court: Mrs. Willis, when you expressed mental reservations about the death penalty then that triggers some questions that I must ask you.

Would your mental reservations about capital punishment prevent you from making an impartial decision as to the defendant's guilt or innocence in this case?

"Juror No. 3 Mrs. Willis: I can find them guilty, but I couldn't impose....

"The Court: Would you be able to make an impartial decision as to their guilt or innocence?

"Juror No. 3 Mrs. Willis: I don't know.

"The Court: Because of your mental reservations about capital punishment, do you state that you automatically could never vote to impose the death penalty in this or any other case?

"Juror No. 3 Mrs. Willis: Yes, I don't think....

"The Court: Would you automatically refuse to consider the imposition of capital punishment in this case regardless of the law and the evidence in the case?

"Juror No. 3 Mrs. Willis: Yes.

"The Court: You get to go back with the children. You may be excused."

■ We hold that the excusal of juror Willis was proper under our decision in *State v. Harrington*, Tenn., 627 S.W.2d 345, 350 (1981) and under *Wainwright v. Witt*, —— U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). In *Wainwright*, the Supreme Court expanded the discretion which *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) had allowed trial courts in excusing jurors in death penalty cases on grounds that they

---

1. Another aspect of the admission of co-defendant Flynn's statements will be considered here- inafter in determining whether error was committed in assessing the death penalty.

opposed, to one degree or another, the imposition of the death penalty. Now, the test is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." In our opinion, however, the excusal of Mrs. Willis would have been proper under the stricter standard set out in *Witherspoon*. We find no error in the excusal of Mrs. Willis.

### (d)

Next, the defendant argues that the trial court erred in refusing to permit his counsel during voir dire examination to ask prospective jurors:

> "How many of you believe that if [the death penalty were imposed] something or someone thereafter would probably intercede to see that it wasn't carried out?"

Essentially the same question was held to be improper in *State v. Strouth*, Tenn., 620 S.W.2d 467, 471 (1981). There the defendant attempted to ask jurors: "Do you realize that if Mr. Strouth is sentenced to die that he will actually be killed?"

■ We hold, for the same reasons expressed in *Strouth*, that the court did not err in refusing to allow defense counsel to ask the question above quoted in the instant case.

### (e)

During his opening statement, the prosecuting attorney stated:

> "He [detective James Moffit] saw that Leon Williams was there and he told him at that time, he told Mr. Grizzle, he said 'I know Leon Williams.' He said, 'you had better not have nothing to do with him.'"

Counsel for defendant Williams objected and the court sustained the objection as follows:

> "The Court: Sustained. That is not proper argument, that is not proper opening statement and, members of the jury, it may become relevant at

some period of time; but I will ask you to disregard that remark entirely and not consider it for any purpose."

■ Defense counsel did not move for a mistrial but did object to the prosecutor's statement. We are satisfied that the trial court's sustaining of the objection and his admonition to the jury to disregard the improper statement of the prosecuting attorney prevented error. The jurors are presumed to have heard and followed the trial judge's instruction.

### (f)

■ We find no merit in the defendant's insistence that the trial court erred in admitting evidence concerning the defendant's confrontation with Detective Moffit on the evening following the murder of the deceased. That incident was relevant to show that, shortly after the killing, the defendant apparently thought that the police were looking for him, thus evidencing a consciousness of guilt for the killing. The trial judge properly instructed the jury concerning a correct consideration of this evidence. We find no error.

### (g)

After the defendant and his co-defendant Flynn were arrested for this murder and while they were occupying the same jail cell, police officers eavesdropped and recorded their conversation on tape and the tape was played at trial. The defendant bases his attack, not on constitutional grounds, but upon the basis of 18 U.S.C., § 2510, *et seq.*, which makes it illegal for any person to willfully intercept any "wire or oral communication" and imposes criminal and civil sanctions for so doing. This statute also prohibits the admission into evidence of illegally intercepted wire or oral communications before either federal or state courts. 18 U.S.C., §§ 2515, 2518(10)(a). The State argues that, insofar as the act purports to prescribe a rule of evidence for the state courts on non-constitutional grounds, it is unconstitutional; but, we do not reach that question because

we interpret the act to have no application to this taped conversation.

■ A protected "oral communication" is one "uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." Several times during the taped conversation the defendant stated that "there is probably a bug in here," clearly demonstrating that he had no actual expectation of privacy. Moreover, such an expectation of privacy is not justified in a jail cell. *Lanza v. New York*, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962); 1968 U.S.C. & A.N. 2177; *People v. Suttle*, 90 Cal.App.3d 572, 153 Cal. Rptr. 409 (1979); *People v. Califano*, 5 Cal.App.3d 476, 85 Cal.Rptr. 292 (1970).

### (h)

■ The prosecution sought to show that two checks totalling $1,400.00 and written on the victim Grizzle's bank account were not genuine but had been forged by the defendant Williams. In support of this theory, the State offered the testimony of Mrs. Vivian Luney, vice president of the loan department at Mr. Grizzle's bank, to testify concerning the genuineness of the drawer's signature. The defendant contends that she was not qualified to give an opinion. For a period of 22 years the witness had examined from four to five signatures per year to determine their authenticity and she had seen and compared Mr. Grizzle's signature card and other checks which he had written although she was not familiar with his signature prior to this case. She was allowed to testify that in her opinion the signatures on these two checks were not in the handwriting of Mr. Grizzle. The trial judge instructed the jury respecting the weight they were to give to this testimony of the witness and we find no error in allowing her testimony. *Allen v. The State*, 22 Tenn. 367, 368 (1842); *McCormick on Evidence*, § 221 (2d ed. 1972). The testimony was admissible; its weight was for the jury.

### (i)

One of the key witnesses for the prosecution was William Douglas Helton who testified that while in jail he overheard defendant Williams make incriminating statements to another prisoner, Julius Hollifield. Prior to trial, the defendant moved the court for an order requiring the State to disclose all witnesses to whom it had offered immunity or other favors in exchange for testimony in this case. The order was granted and the District Attorney, with respect to witness Helton, denied that any promises of leniency or other favor had been offered to Helton in exchange for his testimony against the defendant in this case. The defendant argues that, in fact, the District Attorney had agreed to a plea bargain with Helton whereby he would receive a very lenient sentence in exchange for his testimony in the case at bar.

Helton had already been convicted of stealing cattle from his father and at the time of the events here at issue he was in jail for a second theft of his father's cattle and was awaiting trial on the new charges. The District Attorney admitted that he had discussed Helton's case with Helton's attorney and with Helton's father, who happened to be the prosecuting witness on the pending charges, and that the date which had been fixed for Helton to enter his plea of guilty and to receive a sentence on the pending charges had been passed from a date prior to the trial of the instant case until some time after the case at bar should have been concluded but denied that he had talked to the witness Helton or had made any plea bargain with him whatsoever.

After this trial was concluded and at the hearing of the defendant's motion for a new trial, it was shown that subsequent to this trial Helton had in fact entered a plea of guilty to the pending larceny charges and, as the result of an agreement approved by the office of the District Attorney General, he had received a minimum sentence of three years on all three grand larceny charges, including the first and the second charges of stealing his father's cattle.

The defendant contends that the failure or refusal of the District Attorney General to disclose the alleged plea bargain agreement that he had with the witness Helton to the jury in the case at bar constitutes a denial of due process to the defendant Williams. *See Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

▮▮▮▮ When the reliability of a witness may well be determinative of guilt or innocence, the non-disclosure of evidence affecting his credibility may justify a new trial, regardless of the good or bad faith of the prosecutor. *Giglio v. United States,* 92 S.Ct. 763, 766. The difficulty with the defendant's argument is that the record does not support his insistence that leniency had been promised to the witness Helton in exchange for his testimony. When specifically asked about the matter, the District Attorney General positively asserted that no leniency had been promised to Helton and the record is devoid of any evidence that plea negotiations had in fact taken place or that the State had offered anything in exchange for a guilty plea from Helton. The fact that Helton's case had been passed over for disposition to a time following the trial in the case at bar and at that hearing he had entered a plea of guilty and was sentenced to the minimum sentence of three years does not establish the defendant's theory; a suspicion, yes, but nothing more.

### (j)

Next, the defendant argues that the trial court erred in failing to grant a mistrial because of improper argument made by the prosecuting attorney in closing argument. As he neared the end of his argument, the prosecutor stated to the jury:

"You know, there is one other thing that I didn't understand until late yesterday afternoon. I kept sitting there, and Mr. Christiansen (co-counsel) every once in a while, you know, he helped me, I guess, or at least he caused me to think about it, and they kept saying, 'your house

burned,' 'your house burned,' and, you know, I got to thinking about it. I appreciate that because it was the State's witnesses whose houses were being burned and who were being intimidated."

[At this point counsel for the defendant objected.]

"The Court: Sustained. I think it is. Members of the jury you must not make any inference from that evidence, and I'll ask you to strike that from your consideration and not to consider it for any purpose at all."

▮▮▮ There had been testimony that the homes of at least two of the State's witnesses had burned since the murder occurred but there was no proof whatever concerning the reasons that those houses had burned or the possibility of intimidation. However, it is our conclusion that the trial judge handled the matter properly by instructing the jury to pay no attention whatsoever to the improper argument. He did not err in failing to grant a mistrial.

### (k)

▮▮▮ The trial court did not err in admitting into evidence a photograph of indentations found in the brick chimney of the burned house of the victim. The unspoken interpretation of what those holes were was that they were made by bullets; however, the trial judge ordered the witness not to speculate on the origin of the holes and the witness testified that he did not know how they were made.

We find no reversible error in the guilt phase of the defendant's trial.

## II. PENALTY PHASE

The jury predicated its imposition of the death penalty upon the following findings in its verdict:

"The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.

"The murder was committed while the defendant was engaged in committing robbery, arson, and unlawful throwing or

placing or discharging of a destructive device or bomb."

In pertinent part, the death penalty statute provides:

"No death penalty shall be imposed but upon a unanimous finding, as heretofore indicated, of the existence of one or more of the statutory aggravating circumstances, which shall be limited to the following:

\* \* \* \* \* \*

"(5) The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind;

\* \* \* \* \* \*

"(7) The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb; ...." T.C.A., § 39–2–203(i)(5), (7).

We first discuss the aggravating circumstance found in subparagraph (5), above quoted, as it relates to the arguments made by defendant.

In *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the Supreme Court of the United States considered the validity of a provision of the Georgia death penalty statute which defined an aggravating circumstance as follows:

"[The murder] was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim."

The Court noted that in its earlier decision in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), it had held that the quoted Georgia statutory aggravating circumstance was not unconstitutional on its face and had affirmed its validity on the assumption that the Georgia courts would adopt a restricted interpretation of the quoted language which would circumscribe the discretion of juries in applying the aggravating circumstance to specific cases. The Court observed that the issue before it in the *Godfrey* case was whether, in affirming the imposition of the sentence of death, the Supreme Court of Georgia had adopted such a broad and vague construction of the quoted aggravating circumstance as to violate the Eighth and Fourteenth Amendments to the U.S. Constitution. The court observed:

"A capital sentencing scheme must, in short, provide a 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.' (Quoting from its opinion in *Gregg v. Georgia, supra.*)
"This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.' (Citations omitted.) It must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.' As was made clear in *Gregg*, a death penalty 'system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur.' (Citation omitted.)
"In the case before us the Georgia Supreme Court has affirmed a sentence of death based upon no more than a finding that the offense was 'outrageously or wantonly vile, horrible and inhuman.' There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious

infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.' Such a view may, in fact, have been one to which the members of the jury in this case subscribed. If so, their preconceptions were not dispelled by the trial judge's sentencing instructions. These gave the jury no guidance concerning the meaning of any of § (b)(7)'s terms. In fact, the jury's interpretation of § (b)(7) can only be the subject of sheer speculation.

"The standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury in this case was in no way cured by the affirmance of those sentences by the Georgia Supreme Court." *Godfrey v. Georgia*, 100 S.Ct. at 1764–65.

The Supreme Court concluded in *Godfrey* that the death penalty there imposed could not stand, because the evidence in that case did not show "a consciousness materially more 'depraved' than that of any person guilty of murder." *Ibid.* at 1767.

In *State v. Pritchett*, Tenn., 621 S.W.2d 127 (1981), we considered the validity of the "heinous, atrocious, or cruel" aggravating circumstance in the light of the *Godfrey* decision and in light of the particular facts involved in *Pritchett*. In concluding that the evidence was inadequate to support the jury's finding of that aggravating circumstance, we observed:

"... it is clear that a constitutional construction of this aggravating circumstance requires evidence that the defendant inflicted torture on the victim before death or that defendant committed acts evincing a depraved state of mind; that the depraved state of mind or the torture inflicted must meet the test of heinous, atrocious or cruel." 621 S.W.2d at 139.

■ In the instant case, the defendant, relying upon our decision in *Pritchett*, argues that the evidence does not support a finding that he inflicted torture upon the victim before death and thus that the "heinous, atrocious, or cruel" aggravating cir-

cumstance was not proven. We agree that the evidence does not support a finding beyond a reasonable doubt that the defendant tortured the victim in this case prior to his death. However, the question now arises whether or not the evidence supports a finding of depravity of mind, separate and apart from torture.

Until now we have not considered whether or not, and if so, to what extent, depravity may be shown by evidence of defendant's conduct which does not amount to torture of the victim prior to his death. Other courts, construing "aggravating circumstance" statutory provisions more or less equivalent to our own have reached varying conclusions regarding the question whether or not depravity of mind may consist of evidence of conduct other than the infliction of torture upon the victim. *See: State v. Ortiz*, 131 Ariz. 195, 639 P.2d 1020, 1035 (1981); *State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1, 9–11 (1983); *State v. Richmond*, 136 Ariz. 312, 666 P.2d 57, 64 (1983); *Hance v. State*, 245 Ga. 856, 268 S.E.2d 339 (1980); *Jones v. Commonwealth*, Va., 323 S.E.2d 554, 565 (1984); *State v. Preston*, Mo., 673 S.W.2d 1 (1984); *Jackson v. State*, Fla., 451 So.2d 458 (1984); *State v. Monturi*, 178 N.J.Super. 317, 478 A.2d 1266 (1984).

The New Jersey statute defines an aggravating circumstance as:

"The murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim."

In the *Monturi* case, *supra*, the New Jersey court construed that provision as follows:

"That factor requires (1) a showing of torture, depravity of mind or an aggravated battery *to the victim;* (2) depravity of mind is the mental state which leads to torture or aggravated battery *before* the victim is killed, and (3) torture and aggravated battery must be construed together, imposing a requirement for evidence that the victim was seriously and physically abused prior to death. (Citations omitted.) Under the *Godfrey* test,

evidence of 'post-murder events' or 'offenses' to other victims, as in this case, are irrelevant.... This aggravating factor is sustained only by proof of pre-murder conduct of the defendant. The proof of post-murder conduct and offenses aimed at other victims is irrelevant...." 478 A.2d at 1270.

A comparable aggravating circumstance in the Florida statute is that the murder was "... especially heinous, atrocious or cruel." Neither torture nor depravity of mind is mentioned. Construing this aggravating circumstance provision in the *Jackson* case, *supra*, the Florida court said:

"Actions after the death of the victim are irrelevant in determining this aggravating circumstance. (Citation omitted.) Also, when the victim becomes unconscious, the circumstances of further acts contributing to his death cannot support a finding of heinousness. (Citation omitted.) The record contains no evidence that McKay remained conscious more than a few moments after he was shot in the back the first time, and he therefore was incapable of suffering to the extent contemplated by this aggravating circumstance." 451 So.2d at 463.

The aggravating circumstance provision construed in the above-cited Arizona cases is as follows: "Defendant committed the offense in an especially heinous, cruel or depraved manner." The Arizona cases have held that "cruelty" involves the pain and distress visited upon the victim, while "heinous" and "depraved" concern the mental state and attitude of the perpetrator as reflected in his words and actions. Mental distress is recognized as well as physical. In the *Gretzler* case, *supra*, the court observed:

"In contrast to the emphasis upon the victim's suffering and feelings in the case of cruelty, the statutory concepts of heinous and depraved involve a killer's vile state of mind *at the time of the murder*, as evidenced by the killer's actions." (Emphasis added.) 659 P.2d at 10.

The court then proceeded to list a number of specific factors which had led to a finding of heinousness or depravity in the Arizona cases, *viz.*, the apparent relishing of the murder by the killer, the infliction of gratuitous violence on the victim, the needless mutilation of the victim, the senselessness of the crime, and the helplessness of the victim. The Arizona cases hold that "heinous" and "depraved" concern "the murderer's mental state *at the time of the killing*." (Emphasis added.) *State v. Lujan*, 124 Ariz. 365, 604 P.2d 629, 636 (1979). The Arizona cases hold that to make out cruelty under the statute the evidence must show that the victim was made to suffer during the commission of the murder; cruelty cannot consist of abuse of the victim's body after his death. *State v. Ortiz, supra.*

The Virginia court in *Jones v. Commonwealth, supra*, held that the words "aggravated battery" and "torture" ordinarily connote conduct preceding the death of the victim but that "depravity of mind"

"can exist independently of the presence of torture or aggravated battery. (Citation omitted.) In our view, an aggravated battery such as mutilation, gross disfigurement, or sexual assault committed upon a corpse or an unconscious body evinces depravity of mind within the contemplation of our death-penalty statute." 323 S.E.2d at 565.

The Virginia court did not specify how close to the time of death or loss of consciousness of the victim these further abuses of the victim's body must occur in order to constitute "depravity of mind" within the meaning of the aggravating circumstance statute.

The Georgia statute provides in pertinent part:

"The offense of murder ... was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or aggravated battery to the victim."

In construing this statute, the Georgia court in *Hance v. State, supra*, stated, in part:

"Torture occurs when the victim is subjected to serious physical abuse before death (citation omitted). Serious sexual abuse may be found to constitute serious physical abuse. (Citation omitted.)....

"Evidence of psychological abuse by the defendant to the victim before death where it is shown to have resulted in severe mental anguish to the victim in anticipation of physical harm may amount to serious physical abuse (i.e. torture of the victim), and also will support a finding of depravity of mind of the defendant.

"A defendant who mutilates or seriously disfigures the victim's body after death ..., or who commits a sex act upon the victim's body after death may be found to have a depraved mind and such acts would be sufficient to show depravity of mind of the defendant within the meaning of this statute ....

"As heretofore stated, the evidence must be sufficient to satisfy the first major component of statutory aggravating circumstance seven (7) ('outrageously or wantonly vile, horrible or inhuman'), and at least one (or more) of the three parts of the second component (aggravated battery to the victim, or torture to the victim, or depravity of mind of the defendant)." 268 S.E.2d at 346.

While the foregoing authorities from other jurisdictions are somewhat instructive, we must determine the legislative intent embodied in the language of our own statute, determine its constitutional validity, and, finally, determine whether or not the evidence in the instant case supports the jury's finding that this aggravating circumstance existed.

 The words of the statute must be given their ordinary and natural meaning. In determining that meaning, we refer to the *American Heritage Dictionary of the English Language* where we find the following definitions:

Heinous—"Grossly wicked or reprehensible; abominable; odious; vile."

Atrocious—"Extremely evil or cruel; monstrous; exceptionally bad; abominable."

Cruel—"Disposed to inflict pain or suffering; causing suffering; painful."

Torture—"The infliction of severe physical pain as a means of punishment or coercion; the experience of this; mental anguish; any method or thing that causes such pain or anguish; to inflict with great physical or mental pain."

Depravity—"Moral corruption; wicked or perverse act."

 Our statute provides that it is *the murder* which must be *especially* heinous, atrocious, or cruel. The second clause of this statutory provision, *viz.*, "... in that it involved torture or depravity of mind," qualifies, limits and restricts the preceding words "especially heinous, atrocious or cruel." This second clause means that to show that the murder was especially heinous, atrocious or cruel the State must prove that it involved torture of the victim or depravity of mind of the killer.

 "Torture" means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. In proving that such torture occurred, the State, necessarily, also proves that the murder involved depravity of mind of the murderer, because the state of mind of one who willfully inflicts such severe physical or mental pain on the victim is depraved.

 However, we hold that "depravity of mind" may, in some circumstances, be shown although torture, as hereinabove defined, did not occur. If acts occurring after the death of the victim are relied upon to show depravity of mind of the murderer, such acts must be shown to have occurred so close to the time of the victim's death, and must have been of such a nature, that the inference can be fairly drawn that the depraved state of mind of the murderer existed at the time the fatal blows were inflicted upon the victim. This is true because it is "the murderer's state of mind *at the time of the killing*" which

must be shown to have been depraved. (Emphasis supplied.) *State v. Lujan, supra; State v. Ortiz, supra.*

■ Thus, mutilation of the dead body of the victim may be found to constitute depravity of mind, but only if the mutilation occurred so soon after the death of the victim that the inference may be fairly drawn that the murderer possessed that depravity of mind at the time of the actual killing. If the length of time intervening between the time of death of the victim and the time of mutilation of the body is so great that the inference cannot be fairly drawn that the murderer possessed the depravity of mind at the time the fatal blows were inflicted, then it cannot be said that the murder, itself, involved depravity of mind.

■ We consider now the contention of the defendant that the evidence does not support the jury's finding of the two aggravating circumstances. We agree that the evidence, measured by the standard laid down in *Jackson v. Virginia, supra,* is not sufficient to support the finding of the jury respecting the aggravating circumstance defined by T.C.A., § 39–2–203(i)(5). It does not support a finding that the defendant tortured the victim prior to his death. All that is shown by the evidence about the killing itself is that the victim was shot four times. In our opinion, this does not reflect "a consciousness materially more depraved than that of any person guilty of murder." *See Godfrey v. Georgia, supra.*

The State suggests that the jury's finding of this aggravating circumstance was probably based upon evidence of statements made by co-defendant Flynn that Mr. Grizzle had been shot and had "flopped around." The difficulty with this is that this evidence of Flynn's statements cannot be considered because to do so would violate the defendant's rights under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) since Flynn was a non-testifying co-defendant, and thus was not subject to cross-examination by the defendant. The evidence of Flynn's state-

ments did not constitute a *Bruton* violation insofar as the determination of his guilt is concerned because all references to the defendant were removed from the evidence of Flynn's statements but, the evidence of Flynn's description of the murder scene and the later abuse of the victim's body does furnish substantial grounds for the jury to increase the defendant's punishment from life imprisonment to the death penalty. *See: State v. Elliott,* Tenn., 524 S.W.2d 473, 477–78 (1975). In *Elliott* we said:

> "The Court of Appeals held in its majority opinion that 'the *Bruton* rule has no application where, as in the case before us, both the jointly tried codefendants confessed,' citing *O'Neil v. State,* 2 Tenn. Crim.App. 518, 455 S.W.2d 597; *Briggs v. State,* 501 S.W.2d 831 (Tenn.Crim.App. 1973). We think this statement is an over-simplification of the impact of the *Bruton* rule. The fact that jointly tried codefendants have confessed precludes a violation of the *Bruton* rule where the confessions are similar in material respects, which was the situation in both the *O'Neil* and the *Briggs* cases, *supra.* But where, the confession of one non-testifying codefendant, contradicts, repudiates, *or adds to* material statements in the confession of the other non-testifying codefendant, so as to expose the latter to an increased risk of conviction *or* to an increase in the degree of the offense with correspondingly greater punishment, the latter codefendant is entitled to test the veracity of the statements in the confession of his codefendant. A denial to him of his right through the failure of his codefendant to take the stand brings the *Bruton* rule into play." (Emphasis added.) 524 S.W.2d 477–78.

When the co-defendant Flynn's statements are removed from consideration because of the *Bruton* violation there is no evidence in the record that Mr. Grizzle "flopped around" after he was shot.

The State also argues that the circumstances of the disposal of Mr. Grizzle's body, including the use of an explosive,

dogs and the burning of the house with Mr. Grizzle's body in it, were circumstances supporting the jury's finding of the defendant's depravity of mind at the time of the murder. However, under the theory of the State that the killing occurred either in the late hours of Monday, January 12, or the early hours of Tuesday, January 13, and that the victim's body was blasted between 10:00 and 11:00 p.m. on Wednesday night, January 14, and that the burning of the house with the victim's body in it occurred between 1:00 and 2:00 a.m. Thursday, January 15, which theory is supported by the evidence, the interval of time between the death of the deceased and the mutilation of his body was so great that under the guidelines which we have set out hereinabove, the inference cannot be reasonably drawn that the depravity of mind demonstrated by the abuse of the victim's body existed at the time he shot the victim to death. Therefore, we conclude that the evidence does not support the finding of the jury that this murder was "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind."

The defendant also contends that the evidence is insufficient to support the finding of the jury that:

"The murder was committed while the defendant was engaged in committing robbery, arson, and unlawful throwing or placing or discharging of a destructive device or bomb."

This finding was based upon the aggravating circumstance defined in T.C.A., § 39-2-203(i)(7), which provides:

"The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb."

In support of the jury's findings in favor of this aggravating circumstance, the State argues:

"There was evidence to support the jury's finding that the murder had been committed during the perpetration of a robbery. The proof showed that defendant stated to a third party that he was going to 'rob' the victim and that he shot the victim because 'he got caught at it.' The witness who overheard this conversation restated it by saying that defendant 'went in there to rob him and then he got in an argument over the robbery.' Thus the evidence supported two possible versions of the murder, both of them making out a robbery. The first version was that defendant was surreptitiously stealing from Grizzle, who caught defendant in the act. The intended larceny then turned into a robbery, since defendant had to use violence and force in order to complete his taking of Grizzle's goods.... The second version of the offense inferable from the proof was simply that defendant had committed an armed robbery of the victim (stealing his checkbook) and then decided to kill the victim. In any event, the proof clearly supports the jury's finding that the murder was committed during the perpetration of a robbery."

We conclude that this theory of the State is supported adequately in the evidence. The witness, William Douglas Helton, testified that he, the defendant and Julius Hollifield were all cellmates together and that he overheard the defendant relate to Hollifield that he had been "going to rob the man" (Mr. Grizzle) and "... I shot him because I got caught at it, didn't want to get caught at it." Under all of the circumstances, very little can be said in favor of the credibility of the witness Helton but it was primarily the function of the jury and the trial judge to determine whether he was to be believed. They have made that determination and we are not justified in overturning it.

Certainly the evidence shows that beginning the very next day after the killing the defendant began disposing of the victim's motor vehicles and his cash by means of forging checks on his bank account.

■ Thus, we conclude that the evidence is sufficient to support the jury's finding that this particular aggravating circumstance existed.

Next, the defendant insists that the trial judge erred in failing to adequately instruct the jury in the penalty phase of the trial regarding the statutory definitions of the felonies which the jury was asked to consider in determining whether it should find the existence of the aggravating circumstance defined in T.C.A., § 39-2-203(i)(7). For instance, the trial judge in the penalty phase of the trial did not instruct the jury respecting the definition of robbery. Defendant argues, of course, that a jury cannot determine whether the murder was committed during the commission of robbery unless it knows what robbery is. We note, also, that the court did not instruct the jury concerning the legal significance of the words "heinous," "atrocious," "cruel," "torture," or "depravity of mind" as those terms are used in the aggravating circumstance defined in T.C.A., § 39-2-203(i)(5).

■ It is of the utmost importance that trial judges in death penalty cases instruct the jury regarding relevant statutory definitions of felonies and the legal significance of other legal terms which are necessary for the jury to understand in determining whether or not aggravating circumstances defined in the statute have been established. *Godfrey v. Georgia, supra; State v. Moore,* Tenn., 614 S.W.2d 348 (1981).

In *State v. Moore* this Court stated:

"The jury found that the murder was committed while the accused was engaged in committing one of the several felonies listed in T.C.A. § 39-2404(i)(7) [now, T.C.A., § 39-2-203(i)(7) ] that of kidnapping. The evidence justifies the finding of the jury in that regard. However, the trial judge did not define for the jury the criminal offense of kidnapping. This was the only one of the listed felonies upon which the State relied. While the evidence clearly supports a finding that the accused did abduct the victim at gunpoint and executed him, proper procedure, in our opinion, requires that the trial judge provide the jury with the statutory definition of any felony listed in this code section upon which the State relies. Since in the present case the statutory requirements were obviously met, we would not necessarily reverse on this point alone. However, since a rehearing is required, we direct that the trial judge include in his instructions to the jury the statutory definition of any felony relied upon by the State as an aggravating circumstance. This practice should regularly be followed by trial judges in the sentencing phase where the provisions of this section are invoked to establish an aggravating circumstance." 614 S.W.2d at 350-51.

Moreover, in *Godfrey,* the Supreme Court stated:

"In the case before us the Georgia Supreme Court has affirmed a sentence of death based upon no more than a finding that the offense was 'outrageously or wantonly vile, horrible and inhuman.' There is nothing in these words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.' Such a view may, in fact, have been one to which the members of the jury in this case subscribed. If so, their preconceptions were not dispelled by the trial judge's sentencing instructions. These give the jury no guidance concerning the meaning of any of § (b)(7)'s terms. In fact the jury's interpretation of § (b)(7) can only be the subject of sheer speculation.

"The standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury in this case was in no way cured by the affirmance of those sentences by the Georgia Supreme Court." 100 S.Ct. at 1765.

■ In our opinion the penalty phase instructions of the trial judge in the instant case failed to measure up to the standard required by the foregoing quotation from *Godfrey, supra,* and by the requirement of this Court stated in *State v. Moore, supra.* Unless a jury is instructed as required in those cases, its imposition of the death penalty cannot stand.

■ We find no merit in the contention of the defendant that the court erred in failing to give his requested instructions. *State v. Melson, supra.* Likewise, a majority of the Court is of the opinion that the defendant's argument that the Tennessee death penalty statute constitutes cruel and inhuman treatment within the meaning of the Eighth Amendment to the Constitution of the United States is without merit. *State v. Dicks,* Tenn., 615 S.W.2d 126 (1981).

■ The defendant's contention that T.C.A., § 39–2–203(i)(5), is unconstitutionally vague is without merit, *Godfrey v. Georgia, supra, State v. Pritchett, supra,* so long as the abstract terms employed therein are construed and interpreted as we have done in this opinion and other opinions of this Court. But, we reiterate that it is equally important in the application of this aggravating circumstance that the jury be fully instructed as we have herein required. Without such instructions we have "a basically uninstructed jury," as stated by the Supreme Court in *Godfrey.* Such a jury cannot lawfully impose the death penalty.

We have considered the defendant's other contentions and find them to be without merit.

Our conclusion is that no reversible error was committed in the guilt determination phase of the trial, but, we conclude that reversible error was committed in the penalty phase of the trial, in that:

■ (1) Evidence in support of one of the aggravating circumstances found by the jury was admitted in violation of defendant's rights under *Bruton v. United States, supra,* and without that evidence the record does not support the jury's finding of that aggravating circumstance. Faced with this problem in other cases this Court has unanimously held that

"The probability of prejudice resulting from the consideration of the improperly admitted evidence, in our opinion requires that the sentence of death be reversed and the cause be remanded ... for a sentencing hearing." *State v. Teague,* Tenn., 645 S.W.2d 392, 399 (1983).

*See, State v. Adkins,* Tenn., 653 S.W.2d 708 (1983); *State v. Johnson,* Tenn., 661 S.W.2d 854 (1983); *State v. Moore, supra; State v. Pritchett. See, also, Zant v. Stephens,* 456 U.S. 410, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982), wherein the Georgia Supreme Court set aside one of three aggravating circumstances but affirmed a sentence of death but, upon certiorari review, the Supreme Court remanded the case to the Georgia Supreme Court for an explanation of why the elimination of one of the three aggravating circumstances found by the jury did not require a re-sentencing of the defendant.

■ (2) The instructions to the jury in the penalty phase of the trial were not adequate to sufficiently inform the jury and control its discretion in imposing the death penalty. Accordingly, the judgment of the trial court sustaining the defendant's conviction of first degree murder is affirmed but the verdict and sentence of the court imposing the death penalty is set aside and this cause is remanded to the trial court for a new trial respecting the imposition of punishment only.

COOPER, C.J., and FONES, HARBISON and DROWOTA, JJ., concur.