IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
APRIL 1997 SESSION



FILED

November 5, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | No. 02C01-9603-CC-00085 |
| | ) | |
| Appellee | ) | |
| | ) | LAUDERDALE COUNTY |
| V. | ) | |
| | ) | HON. JON KERRY BLACKWOOD, |
| KELVIN ANTHONY LEE, | ) | JUDGE |
| | ) | |
| Appellant. | ) | (Felony Murder) |
| | ) | |
| | ) | |

For the Appellant:

Gary F. Antrican
District Public Defender
P.O. Box 700
Somerville, TN 38068
(At trial and of counsel on appeal)

C. Michael Robbins
Assistant Public Defender
P.O. Box 700
Somerville, TN 38068
(At trial)

Jan R. Patterson
225 W. Baltimore Street
Jackson, TN 38301
(On appeal)

For the Appellee:

John Knox Walkup
Attorney General and Reporter

Ruth Thompson
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

Elizabeth T. Rice
District Attorney General
302 Market Street
Somerville, TN 38068

James W. Freeland
Assistant District Attorney

OPINION FILED: _____

AFFIRMED

William M. Barker, Judge

The appellant, Kelvin Anthony Lee, appeals as of right the sentence he received in the Lauderdale County Circuit Court following his plea of guilty to the offense of felony murder. The appellant was sentenced by a jury to life in prison without the possibility of parole upon its finding that the murder of William Daniels, Jr. was especially heinous, atrocious, or cruel.

On appeal, the appellant alleges that the following errors occurred in the sentencing process:

(1)     the trial court committed plain error in permitting a jury to sentence appellant after accepting appellant's waiver of jury sentencing;

(2)     the trial court erred in permitting the introduction of inflammatory and cumulative photographs;

(3)     the verdict forms did not correctly state the law regarding mitigating factors;

(4)     the trial court failed to exercise its duty to act as thirteenth juror; and

(5)     the evidence was insufficient to support the application of the heinous, atrocious or cruel aggravating circumstance.

After a complete review of the record, we find that the trial court committed no reversible error. Accordingly, the appellant's sentence of life without the possibility of parole is affirmed.

**FACTUAL BACKGROUND**

On the afternoon of September 17, 1994, Ricky Daniels drove to his family's farm in Lauderdale County to check on his aging father, William Daniels, Jr., who had been working on the farm that day. He drove to a clearing and spotted his father's truck sitting in the midst of a field, near a small pond. As he drove closer, he realized that his father was pinned underneath the truck and seriously injured. He first thought that an accident had occurred and he called his sister. After surveying the situation,

2

however, he concluded that his father's condition was not accidental, and he contacted an investigator with the Lauderdale County Sheriff's Department.

Authorities conducted an extensive examination of the scene, working throughout the night. Their investigation revealed that Daniels had suffered numerous gunshot wounds and that his body had been run over and crushed by the pickup truck. Evidence at the scene indicated that Daniels' body had been dragged approximately 148 feet while underneath the truck. It also appeared that the body had become dislodged at one point and that the truck backed up and ran over the body again before coming to a stop on the victim. Investigators noticed that the victim's pants pockets were turned inside out and his wallet was missing. Authorities also discovered bicycle tracks at the scene which led to a nearby house where the appellant lived with his family. After questioning several of the appellant's brothers, appellant was brought in for questioning. The appellant made a full confession, admitting that he had robbed and killed Daniels.

Based upon information in appellant's statement, authorities found a gun and bicycle belonging to the appellant in nearby Fisher Pond. The gun contained four live rounds and two spent casings. Authorities also found one of the victim's shoes floating in the pond. Some of the tracks found at the crime scene matched the tires on the bicycle removed from the pond.

The appellant's brother, Michael Lee, gave a statement to police which incriminated the appellant. He said that he was present in a group of people on the night before the murder and had heard the appellant say that he was going to rob Daniels of $400. The next morning, the appellant again told Lee that he was going to rob Daniels, and he took a .22 caliber, western-style, blue steel, six-shot pistol from a car at the Lee home. The appellant left on his bicycle, saying he was going to get $400 from Daniels. He returned home several hours later, "all shook up and sweating." He told Lee that he killed Daniels.

3

Investigators also obtained statements from Simmie Rice and Tyrone Maclin, friends of the appellant. These statements indicated that the appellant had told them about the crime, admitting he robbed and killed Daniels. The appellant was subsequently indicted for premeditated murder, felony murder, and especially aggravated robbery. The State filed notice that it would seek life without the possibility of parole.[1] In support, it alleged that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. See Tenn. Code Ann. §39-13-204(i)(5) (Supp. 1996).[2]

On the morning of trial, the trial court granted the appellant's request for a one-day continuance because of notice of a new State's witness. Later that afternoon, the parties advised the trial court that a plea agreement had been reached. The appellant agreed to plead guilty to felony murder and the State would dismiss the charges of premeditated murder and robbery. After hearing the State's factual summary of proof, the trial court conducted a full examination of appellant and accepted his guilty plea. The trial court also accepted the appellant's waiver of jury sentencing.

Two days later, on the morning of the sentencing hearing, the appellant's counsel advised the trial court that the appellant wished to withdraw his guilty plea and was requesting new counsel. The trial court questioned the appellant, during which he claimed that he pled guilty only because his attorneys forced him to do so. He insisted he was not guilty and alleged that his attorneys were not "doing what they're supposed to." The trial court recessed to permit appellant to discuss the matter with his family. When the appellant returned to court, he announced that he desired to preserve the guilty plea. However, he informed the court that while he was guilty of robbing Daniels, he did not kill him. He professed to know who killed the victim. The court

---

[1]The appellant was seventeen at the time of the offense and was properly transferred from juvenile court. As a result, however, the State was prohibited from seeking the death penalty. Tenn. Code Ann. §37-1-134(a)(1) (Supp. 1994).

[2]An additional aggravator was originally noted, but later withdrawn by the district attorney.

again explained the plea process to the appellant and accepted the appellant's guilty plea, ruling that it was voluntary and knowing.[3]  However, due to the developments in the case and the statements which the appellant made to the court, the trial court declined to accept appellant's waiver of jury sentencing and decided that a jury should be impaneled to decide punishment.  The appellant chose to retain his appointed counsel.

At the sentencing hearing, the State, through the testimony of TBI agent Jack Van Hooser, Jr., introduced the appellant's statement confessing to the crime.  In the statement, the appellant explained that he had been fishing at the pond on Daniels' farm the morning of the murder.  Daniels arrived in his truck and told the appellant he did not have permission to be on his property and asked him to leave.  The appellant pulled out a pistol, ordered Daniels out of the truck, and asked for the keys to the truck.  The appellant also commanded Daniels to write him a check for $350.  Daniels replied that he did not have a check, but he could get one for the appellant.  The appellant shot Daniels twice in the head, causing him to fall in the front of the truck, hitting his head on the bumper.  The appellant then shot him four more times, reloaded the six-shot revolver, and fired three or four more shots into Daniels.

According to his statement, the appellant walked to the body and removed eight $100 bills from Daniels' right front pants pocket and $200 in mixed bills out of his left front pocket.  Next, the appellant got in the truck and ran "back and forth" over the body.  He threw the gun and his bicycle into Fisher Pond and ran home.  He later went out and met his friend Simmie Rice.  In the statement, he admitted telling Rice that he robbed and killed Daniels and showed him the money.  Later that night, the appellant

---

[3]Although the appellant does not challenge his guilty plea in this appeal, we have reviewed the plea and find that it is valid under North Carolina v. Alford, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970); and Dortch v. State, 705 S.W.2d 687, 689 (Tenn. Crim. App. 1985).  The appellant proclaimed that he planned and participated in the robbery of Daniels, but that he did not kill him.  Nevertheless, after advice from his family and his defense counsel, the appellant requested the trial court to accept his plea of guilt to felony murder so that he could "get on" and "pay his dues."  The trial court fully explained to the appellant that if he pled guilty to the felony murder count, the State would drop the counts of first degree murder and especially aggravated robbery.  The record reflects that the appellant was fully informed of the plea process and had reason to believe that the guilty plea was in his best interest.

5

and Rice used some of the money to buy beer and the appellant also gave some of the money to his friends and to his brother, Michael Lee.

In response to specific questions from law enforcement, the appellant indicated in his statement that the gun belonged to his father and that he had possessed it for about three or four days prior to the murder. He further declared that he ran over Daniels' body "to make sure he was dead." He stated that he was wearing a white T-shirt at the time, which he later burned because it had blood on it.[4] Finally, he said that Rice was holding $400 of the money for him "so [he] wouldn't get busted with it."

Pictures of the victim's injuries and a videotape of the crime scene were introduced through the testimony of Gaston Garrett, the investigator with the Lauderdale County Sheriff's Department. Garrett, the first official at the crime scene, described what he observed upon arrival. The victim's body was lodged underneath the right front of the truck. The right front wheel was resting on the victim's arm. The left door of the truck was spattered with blood, as well as the front bumper and grill. There were blood stains on both of the front tires. He observed several puddles of blood in different places on the ground, and he also discovered skin tissue and flesh on the bolts and metal framework under the truck.

The State also presented testimony from Michael Lee and Tyrone Maclin. Initially, Lee denied telling authorities that the appellant admitted murdering Daniels. However, after the court instructed him about perjured testimony, Lee testified that the appellant had told him he was going to rob and kill Daniels. He also remembered that the appellant told him he shot the victim.

Tyrone Maclin testified that he saw the appellant the day of the murder. According to Maclin, the appellant had a lot of money and told him that he killed Daniels. The appellant further told Maclin that he shot Daniels eleven or twelve times and ran over him with the truck before throwing the gun and bike into the pond.

---

[4]Agent Van Hooser testified that ashes and ribbing from a T-shirt were found in a barrel behind appellant's house. No blood was detected in the ashes.

Lisa Moore, a deputy from the Lauderdale County Sheriff's Department testified that she overheard a disagreement between the appellant and the jail doctor when the doctor visited the appellant on one occasion. She testified that when she returned the appellant to his cell, he commented about the doctor, saying: "He don't know what he's doing. I should kill him like I did [Daniels]."

Dr. O'Brien C. Smith, the deputy chief medical examiner for West Tennessee, performed an autopsy on the victim and testified at the hearing. He stated that Daniels died as a result of numerous gunshot wounds and crushing injuries to the chest and abdomen. He described to the jury fourteen gunshot wounds; eleven in head and neck region, two in the chest, and one in the back. Despite extensive damage to the top of the victim's head and his skull, none of the bullets penetrated the brain. As such, those wounds caused only bruising and bleeding on the brain. The two gunshot wounds to the heart were very serious, but Dr. Smith testified that the victim could have survived for several minutes afterwards with pain and suffering.

As a result of being crushed, all of the victim's ribs were broken with a total of fifty-four fractures which in turn caused bruising of the lungs. Additionally, Dr. Smith indicated that the liver was bruised and the right abdomen surrounding the liver had red abrasions indicative of pressure and force. The victim also suffered crushing injuries to the lower part of his body. The victim's left leg was broken, and he had bruises on his knees and feet, as well as tears and lacerations on his legs. Dr. Smith opined that all of these injuries occurred while the victim was still alive.

The autopsy indicated that the victim was lying down when he was run over by the truck. A heavy abrasion on his back was consistent with the body being dragged underneath a vehicle. Injuries to the front of the body were also consistent with entrapment under a vehicle. Dr. Smith testified that the victim would have experienced pain from the soft tissue injuries and bone fractures. In addition, bleeding

from the head and facial wounds would have obstructed the victim's airway and interfered with his ability to breathe.

The gunshot wound to the back struck the spinal cord and caused some paralysis. On cross-examination, Dr. Smith stated that the spinal wound would have caused loss of feeling from the mid-chest downward. Assuming the wound occurred prior to the crushing injuries, the victim would not have felt the lower rib fractures or the broken leg. However, he still would have felt at least nineteen of the rib fractures, as well as the head and neck wounds. Although Dr. Smith was unable to determine whether the gunshot wounds or the crushing injuries were inflicted first, he believed that the crushing injuries occurred while the victim was still alive because of active bleeding around the fracture sites. Moreover, he admitted that the victim may have been unconscious during those injuries, but he explained that there was no brain damage which would have caused unconsciousness.

The first defense witness was the appellant's friend, Simmie Rice. Despite detailed questioning about his activities on the day of the crime, Rice denied any involvement in the crime. He also denied saying that he killed the victim and then "pinned it" on the appellant. On cross-examination, Rice revealed that the appellant had told him the day before the murder that he was going to rob and kill somebody. Rice saw the appellant the next day and the appellant said he had killed Daniels. The appellant showed him the money and Rice also witnessed the appellant give money to various people. In addition, Rice said the appellant gave him $800 to hold, which Rice turned over to police when he was questioned.

Dr. Luis Wong, a physician who treated inmates at the Lauderdale County jail, was called by the defense to rebut the testimony of Lisa Moore. Dr. Wong testified that he visited the appellant only once at the jail for a routine physical exam. He denied having a confrontation or argument with the appellant during this visit. He further stated that he did not hear the appellant make a remark about killing the victim.

8

On cross-examination, Dr. Wong conceded that he might not have heard the appellant make a remark to the jailer because he was in a different room and he does not pay attention to situations that arise between jailers and inmates.

The appellant's testimony at the sentencing hearing varied substantially from his statement to law enforcement. According to the appellant, he and Rice had planned to rob someone for about a week prior to the murder. The day before the murder, he and Rice decided to rob Daniels. In preparation, the appellant said that he telephoned Daniels and told him that he wanted to buy some watermelons. Daniels told the appellant he would be at the farm around 11:00 a.m. the next day.

The appellant testified that on the day of the murder, he, Simmie Rice, and someone named Jeff Smith met at the appellant's aunt's house and walked toward the pond on Daniels' farm. The threesome waited for Daniels at the pond, during which time the appellant gave the gun to Rice. When Daniels arrived, they confronted him and asked for his money. As Daniels reached into his pocket, the appellant testified that Jeff Smith shot Daniels three or four times. The appellant and Rice then ran to Daniels and took the money from his pockets. As they were taking the money, the appellant testified that Daniels struggled and pulled off Rice's mask.[5] The appellant allegedly told Smith not to kill Daniels, but Smith and Rice said they had to kill Daniels because he could identify them. Smith then fired three more shots and Rice got into the truck and drove over the body. Fleeing the scene, the appellant claimed that Smith threatened to kill him and his family if he did not confess to the police. He explained that this was the reason for the first statement he gave to the authorities. In corroboration of his testimony, the appellant introduced a letter that he wrote to the Lauderdale County Sheriff in February of 1995. In the letter, appellant denied robbing or killing Daniels. He claimed to know who did it and said the "real killer [was] still out there."

---

[5]Appellant explained that they were all wearing masks.

9

The appellant also testified about his home life and education. He stated that he got into a lot of trouble in high school, mostly for fighting and stealing. However, he stated that he never hurt anybody. He was in special education classes at school and, despite being seventeen years of age, had only completed the ninth grade. The appellant further testified that his father is a share cropper and that he and his family live in a four room house. Five brothers sleep together in one bedroom that has two beds, and there are no bathrooms in the house. He also stated that the house has no underpinning and that ten to fifteen dogs live under the house. Under these living conditions, the appellant stated that he robbed Daniels to "get some stuff I ain't had." He admitted he was wrong and that he deserved to be punished.

On cross-examination, the appellant admitted to twenty-three infractions over the course of the last school year. These included sexual harassment of a teacher, assault, profanity, and disobeying authority. He claimed that his brother's testimony was false and also denied the admission to Maclin. In addition, the appellant claimed that part of his statement to authorities was true, but that part of it was not. In contrast to Dr. Smith's testimony, the appellant stated that the gun was fired no more than seven times. Furthermore, he testified that the shooter was twelve to fifteen feet from the victim and could not explain Dr. Smith's testimony that the wounds were inflicted at close range. The appellant admitted that his testimony at the sentencing hearing was the first time he had ever alleged Jeff Smith to be the shooter. He was unable to say where Jeff Smith could be found. Finally, the appellant stated that all shots were fired before dragging the body, which he agreed was a distance of about 140 feet.

Dr. Wyatt Lee Nichols, a clinical psychologist who examined the appellant, also testified for the defense. The records he reviewed indicated that the appellant had a consistent IQ of seventy-one, which indicates borderline intellectual functioning. He stated that the appellant functions intellectually as a twelve year old. Dr. Nichols testified that school was not a place where the appellant felt very successful. In order

10

to compensate for this, he acted out to enhance his self-esteem, which increased as he got older, eventually manifesting in criminal behavior.

Dr. Nichols believed that asking Daniels to write a check during the robbery was consistent with the behavior of a twelve year old. The request indicated that the appellant did not understand the ramifications of his actions. Also, the evidence indicating that the appellant had given away a lot of the money was consistent with this profile. Because the appellant had such a strong desire to belong and have friends, Dr. Nichols opined that he would try to buy friends. Furthermore, Dr. Nichols stated that the appellant would not have the capacity to challenge his own actions as right or wrong. Dr. Nichols characterized the appellant as more impulsive under stress due to his low intellectual capacity. Finally, Dr. Nichols indicated that the appellant was capable of planning a robbery, but was more likely to follow someone else's plan.

The appellant's brother, Joseph Lee, and his friend, Greg Hankins, testified for the defense as well. According to Joseph Lee, two to three days after the murder, Simmie Rice told him "we killed that nigger and your brother took the blame." Hankins testified that he was present and heard Rice make that statement. The appellant's father, grandmother, and a cousin also testified on his behalf.

Based upon the foregoing, the jury sentenced the appellant to life in prison without the possibility of parole, finding that the murder was heinous, atrocious or cruel. Tenn. Code Ann. §39-13-204(i)(5) (Supp. 1996).

### WAIVER OF JURY SENTENCING

The appellant contends that the trial court erred in refusing to honor his waiver of jury sentencing. He argues that the trial judge questioned his own impartiality in the matter and should have recused himself or sought interchange with another judge. We do not agree.

Initially, we note that the appellant failed to raise this issue in his motion for new trial. We recognize that issues regarding sentencing are ordinarily not required to be

11

preserved through their presentation in a new trial motion. See State v. Draper, 800

S.W.2d 489, 497 (Tenn. Crim. App. 1990). However, when sentencing occurs through

a bifurcated trial process that includes the use of the jury to decide sentencing issues

by a reasonable doubt standard, we believe that the sentencing hearing is part of the

case being "tried by a jury" as contemplated by Rule 3(e), Tenn. R. App. P., to require

a motion for new trial. Thus, the appellant's failure constitutes a waiver of the issue.

Tenn. R. App. P. 3(e).

We also note that the appellant cites no authority in support of his argument,

which provides additional grounds for waiver. Tenn. Ct. Crim. App. R. 10(b); State v.

Killebrew, 760 S.W.2d 228, 231 (Tenn. Crim. App. 1988). Moreover, the issue was

not preserved by a motion to recuse or an objection at the hearing. Tenn. R. App. P.

36(a); Killebrew, 760 S.W.2d at 235. Despite these multiple grounds for waiver, we

will address the merits of the issue due to the serious nature of the offense and the

penalty imposed.[6]

As discussed above, the trial judge initially accepted appellant's waiver of jury

sentencing at the same time that he accepted appellant's plea of guilty. On the day of

sentencing, upon learning that the appellant wanted to withdraw his plea, the trial

court examined him under oath. During this examination by the court, the appellant

made equivocal statements concerning his role in the crime, but expressed a desire to

preserve his plea. The trial court accepted the plea, but withdrew his consent to the

waiver of jury sentencing.[7] The trial court remarked:

> However, in light of all the developments in this case; especially in light
> of the last statements that the defendant has made in this case

---

[6]We do not, however, address this issue on the basis of plain error, as the appellant urges us to do. See Tenn. R. Crim. P. 52(b). Appellant fails to explain why this should be considered plain error and our review of the record reveals no rationale supporting consideration on that basis. We are unable to conclude that the trial court committed an egregious error affecting the appellant's substantial rights and thus, it does not rise to the level of plain error. See State v. Adkisson, 899 S.W.2d 626, 639-40 (Tenn. Crim. App. 1994).

[7]Waiver of jury sentencing in first degree murder cases is permitted when the defendant has the advice of his attorney and both the trial court and district attorney consent. Tenn. Code Ann. §39-13-205(b) (1991).

regarding his motivation and his involvement in this case, the Court finds that the Court will not accept that waiver, and has determined that the Court will not consent to it, and that a jury should be impaneled to hear this case with regard to the proper sentence that will be imposed in the case.

. . .

I feel like it would be improper at this time to -- One of the reasons, among the many reasons, that the Court finds that the jury should hear this case, as opposed to the Court, the Court has observed this defendant here, and I've ruled that his plea was knowing and voluntarily made, but there's obviously some emotions that are going through his head at this particular time about what is going on. He's made various statements here to the Court that, upon reflection and consideration, at a sentencing hearing he might not have made, and, therefore, to assure that he's going to have the issue of sentencing impartially determined by a jury, as opposed to this Court now, I think the prudent measure would be to bring a jury in to determine the appropriate sentence to be imposed in this case, and will do so.

We cannot agree with the appellant that these comments indicate that the trial judge had a duty to recuse himself.[8] There is no indication in the record of the trial judge's inability to be impartial. Moreover, the appellant has failed to demonstrate any improper rulings, remarks or conduct by the judge that could be attributed to partiality. See State v. Hurley, 876 S.W.2d 57, 64 (Tenn. 1993), cert. denied, 513 U.S. 933, 115 S.Ct. 328, 130 L.Ed.2d 287 (1994). We find no evidence that the trial court was predisposed to any particular result or that it had already made a decision on key issues. See Alley v. State, 882 S.W.2d 810, 822 (Tenn. Crim. App. 1994). The sentencing issue was tried before an impartial jury who determined punishment based upon the evidence presented. In sum, the record is devoid of any evidence of bias or prejudice.

We find that the trial court acted with extreme caution to empanel a jury for sentencing in light of the appellant's statements made during his examination by the court. We are unable to say the appellant was prejudiced by the trial court's action. The appellant is entitled to no relief on this issue.

---

[8]Appellant never requested recusal.

**ADMISSIBILITY OF PHOTOGRAPHS**

The appellant next contends that the trial court erred in admitting into evidence several photographs of the crime scene depicting the victim's injuries. He argues that their admission was duplicative of evidence contained within a videotape of the crime scene and that their inflammatory and cumulative nature outweighed their probative value. See Tenn. R. Evid. 403.

The admissibility of photographs lies within the sound discretion of the trial court and generally enjoys a liberal admission policy. See State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). On appeal, we will not reverse a decision to admit evidence absent a clear showing of abuse of discretion. Id. The record before us demonstrates no such abuse.

A videotape of the crime scene was played for the jury during the testimony of the investigating officer for the Lauderdale County Sheriff's Department. The videotape portrayed the geography of the crime area and depicted the relative locations of the truck, pond, and the body at the time it was found. This was relevant in light of the appellant's testimony, which included a hand-drawn map of the crime scene indicating the beginning and ending locations of the truck and the victim's body. In addition, the video was the most effective method of showing the jury the distance the body was dragged under the truck, as evidenced by blood smears and stains on the ground.

Still photographs taken at the crime scene were also introduced by the State. The appellant objected to their admission, but the trial court ruled they were relevant to prove the heinousness and atrociousness of the crime, and that their relevancy outweighed any unfair prejudice to the appellant. We agree that these photos were relevant and important in depicting the heinous, atrocious and cruel nature of the injuries. See State v. Cazes, 875 S.W.2d 253, 263 (Tenn. 1994), cert. denied 513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995) (holding that graphic post-mortem

14

photographs were relevant to establish the heinous, atrocious, or cruel aggravating circumstance). While it is true that the videotape and the pictures did contain some of the same material, we cannot say their admission was an abuse of discretion. See State v. Bigbee, 885 S.W.2d 797, 807 (Tenn. 1994) (holding that it was not an abuse of discretion to admit a videotape of the crime scene although it depicted images similar to those in photographs also admitted). The videotape and the photographs served different purposes and were highly probative of the issues to be decided by the jury.

## ERROR IN JURY VERDICT FORM

The appellant next argues that the verdict forms submitted to the jury improperly stated the law on mitigation. According to the appellant, those forms did not instruct the jury that it could find that the mitigating factors outweighed the aggravating circumstance. Therefore, he asserts that the forms did not appropriately instruct the jury on a sentence of life with the possibility of parole. The relevant portion of the jury instructions reads as follows:

> If you do not unanimously determine that the statutory aggravating circumstance has been proved by the State beyond a reasonable doubt, the sentence shall be life imprisonment. You will write your verdict upon the enclosed form attached hereto and made a part of this charge.
>
> The verdict shall be as follows:
>
> "We, the jury, unanimously find that the punishment shall be life imprisonment."
>
> If you unanimously determine that a statutory aggravating circumstance has been proven by the State beyond a reasonable doubt, and you determine that such a statutory aggravating circumstance has been proven beyond a reasonable doubt to outweigh any mitigating circumstance or circumstances, you shall, in your considered discretion, sentence the defendant either to imprisonment for life without possibility of parole or to imprisonment for life. In choosing between the sentences of imprisonment for life without possibility of parole and imprisonment for life, you shall weigh and consider the statutory aggravating circumstance proven by the State beyond a reasonable doubt and any mitigating circumstance or circumstances. In your verdict you shall reduce to writing the statutory aggravating circumstance so found and shall return your verdict upon the enclosed form attached hereto and made a part of this charge.

The verdict should be as follows:

"We, the jury, unanimously find that the State has proven the following listed statutory aggravating circumstance beyond a reasonable doubt." And here you will list the statutory aggravating circumstance. And,

"We, the jury, unanimously find that such statutory aggravating circumstances outweigh any mitigating circumstance or circumstances beyond a reasonable doubt," therefore:

You shall then indicate on the enclosed verdict form either:

"We, the jury, unanimously agree that the defendant shall be sentenced to imprisonment for life without the possibility of parole;" or

"We, the jury, unanimously agree that the defendant shall be sentenced to imprisonment for life."

The jury verdict forms reflected the instructions given by the trial court. However, the appellant requested the trial court to instruct the jury that it must weigh the aggravating and mitigating circumstances before imposing a sentence of life or life without the possibility of parole.

Pursuant to Tennessee Code Annotated, section 39-13-207 (Supp. 1996),[9] if the jury unanimously determines that the State has proven beyond a reasonable doubt one or more of the statutory aggravating circumstances, the jury shall, in its considered discretion, sentence the defendant either to imprisonment for life or life without the possibility of parole. The statute does not direct the jury to find that the aggravating circumstance outweighs the mitigating circumstances before choosing between those possible sentences Therefore, the instruction requested by the appellant was not in conformity with the law and was properly rejected by the trial court.

Nevertheless, we do find that the trial court improperly instructed the jury in this case. The jury instructions and verdict form in the appellant's case required the jury to find that the aggravating circumstance outweighed any mitigating circumstances.

---

[9]The compiler's notes to this statute indicate that it is applicable to all offenses committed on or after July 1, 1993. The statute is applicable to the instant offense, which was committed on September 17, 1994.

Because this weighing language is not required by statute, the jury forms incorrectly instructed the jury.

However, we do not find that the error requires reversal. Requiring the jury to make such a determination held the State to a higher burden than our legislature dictates and thus, provided a heightened protection for the appellant. The appellant suffered no prejudice and, therefore, the error was harmless beyond a reasonable doubt. See Tenn. R. App. P. 36(b).

## THIRTEENTH JUROR

The appellant next contends that the trial court failed to properly exercise its role as thirteenth juror in the proceedings because the order denying the motion for new trial does not specifically contain a thirteenth juror finding. He argues that the omission of such a finding requires a new trial. We disagree.

Under Tennessee Rule of Criminal Procedure 33(f), the trial judge must act as a thirteenth juror and grant a new trial if he or she disagrees with the jury about the weight of the evidence. In every criminal trial, the trial judge has a mandatory duty to serve as the thirteenth juror. State v. Carter, 896 S.W.2d 119, 120 (Tenn. 1995). Contrary to appellant's assertion, however, the trial court is not required to explicitly state on the record that this duty has been performed. See id.; see also State v. Moats, 906 S.W.2d 431, 434 (Tenn. 1995); State v. Burlison, 868 S.W.2d 713, 719 n.2 (Tenn. Crim. App. 1993). Instead, "when a trial judge denies a motion for new trial, an appellate court may presume, in the absence of evidence to the contrary, that the trial judge approved the jury's verdict as the thirteenth juror." See Carter, 896 S.W.2d at 120.

Although the trial court's order denying appellant's motion for new trial does not explicitly state that it exercised its role as thirteenth juror, we presume from the denial of the motion that the trial court discharged its duty. The record contains no evidence

17

that the trial court disagreed with the jury's verdict. Therefore, the appellant's issue is without merit.

### HEINOUS, ATROCIOUS, OR CRUEL AGGRAVATOR

The appellant's final issue challenges the application of the heinous, atrocious, or cruel aggravating circumstance. See Tenn. Code Ann. §39-13-204(i)(5) (Supp. 1996). He claims that the evidence is insufficient to support this aggravator as it was interpreted by our supreme court in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). We disagree.

In order to support the heinous, atrocious or cruel aggravating circumstance, the State was required to prove that the murder involved torture or serious physical abuse beyond that necessary to produce death. See Tenn. Code Ann. §39-13-204(i)(5) (Supp. 1996). "Torture" is defined as the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. See Odom, 928 S.W.2d at 26 (citing State v. Williams, 690 S.W.2d 517 (Tenn. 1985)). "Serious physical abuse" is a distinctive and separate element. "Abuse" means an excessive act or an act which makes improper use of a thing. See id. If proven, the abuse must be physical, not mental, and it must be serious as a matter of degree. See id. Proof of either torture or serious physical abuse beyond that necessary to produce death is sufficient to support the aggravator.

The evidence of Daniels' physical injuries provided overwhelming proof of both torture and serious physical abuse. Daniels endured fourteen gunshot wounds which were fired at close range.[10] The primary area affected by these wounds was Daniels' head and neck, only two wounds were found in the chest area and one in the back. Although the gunshot wounds were not instantly fatal, they caused severe pain and suffering and would have caused death within four or five minutes without immediate

---

[10]Dr. Smith characterized all the gunshot wounds as "near" gunshot wounds. He explained that some of the wounds were fired as close as six inches from the body while others were no more than 24 inches from the body.

18

medical intervention. In addition to the gunshot wounds, Daniels suffered crushing injuries as a result of being run over and dragged a distance of 148 feet by a pickup truck. The active bleeding around the wound sites indicated that the crushing injuries, including the bone fractures, bruises, lacerations, and abrasions, were inflicted while Daniels was still alive. Testimony at the sentencing hearing revealed that Daniels experienced pain from the bone fractures and soft tissue injuries resulting from the crushing and dragging. Furthermore, the large volume of blood loss from the head and neck injuries obstructed Daniels airway and caused anxiety or "air hunger."

In light of this proof, it was reasonable for the jury to conclude that the crushing and dragging of Daniels' constituted torture. These actions inflicted severe physical and mental pain on Daniels while he remained alive and conscious. While suffering from multiple gunshot wounds and struggling for his life, Daniels was forced to endure the horror of being run over and then dragged by a pickup truck. He was then left to die under the weight of the vehicle.

Although Dr. Smith conceded on cross-examination that Daniels may have experienced partial paralysis as a result of one bullet striking the spinal cord, he stated that Daniels would have retained feeling from his mid-chest upward. Thus, Daniels continued to feel the pain from the gunshot wounds. We also recognize that Dr. Smith was unable to say within a degree of medical certainty that Daniels would have remained conscious after the gunshot wounds. However, he did state that there was no medical reason, such as brain damage, which would have caused Daniels to lose consciousness after the gunshots. Dr. Smith was certain that Daniels was still alive when the dragging occurred.

It was within the province of the jury to resolve the factual issues concerning whether Daniels was conscious and capable of feeling the extreme physical pain during the crime. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Considering the evidence in the light most favorable to the State, a rational trier of fact could have

19

found that Daniels was conscious and experienced the serious physical pain during the crime. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Moreover, the proof was sufficient to demonstrate that the appellant inflicted serious physical abuse upon the victim. Running over his body after shooting him fourteen times is clearly excessive, as required by the definition of abuse. See Odom, 928 S.W.2d at 26. Because the gunshot wounds would have caused Daniels' death, the infliction of the crushing injuries was "beyond that necessary to produce death." See Tenn. Code Ann. §39-13-204(i)(5) (Supp. 1996). Therefore, we conclude that the jury was fully justified in finding that the murder of Daniels was especially heinous, atrocious, or cruel.

We affirm the appellant's sentence of life without the possibility of parole.


_____
William M. Barker, Judge


_____
Joseph M. Tipton, Judge


_____
David G. Hayes, Judge