# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 27, 2015 Session

## IN RE: ESTATE OF DENNIE LAMAR TRENT

**Appeal from the Chancery Court for Hawkins County**
**No. 2013-PR-142      Thomas Wright, Judge Sitting By Interchange**

---

### No. E2015-00198-COA-R3-CV-FILED-JANUARY 25, 2016

---

Barry Trent, the Executor of the Estate of Dennie Lamar Trent, appeals the order of the Chancery Court for Hawkins County ("the Trial Court") finding and holding that the claim against the estate filed by Brenda Jefferson for an unpaid $50,000 debt as evidenced by a note is valid. We find and hold that the evidence does not preponderate against the Trial Court's findings, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and JOHN W. MCCLARTY, JJ., joined.

Phillip L. Boyd, Rogersville, Tennessee, for the appellant, Barry Trent, Executor of the Estate of Dennie Lamar Trent.

Wayne Stambaugh, Morristown, Tennessee, for the appellee, Brenda Jefferson.

### OPINION

### Background

Dennie Lamar Trent ("Deceased") died in September of 2013 as a resident of Hawkins County, Tennessee. Deceased's Last Will and Testament ("the Will") was admitted to probate, and Deceased's son, Barry Trent, ("the Executor") was appointed as Executor of Deceased's estate ("the Estate"). In December of 2013, Brenda Jefferson ("Jefferson") filed a verified claim against the Estate alleging a claim for an unpaid loan of $50,000.00 evidenced by a document titled "Promissory Note" ("the Note") and a claim for a Harley Davidson motorcycle allegedly worth $15,000.00. The Executor filed an exception to Jefferson's claim.

The exception to Jefferson's claim was heard by a Special Master. The Special Master entered a report on February 14, 2014 finding and holding, *inter alia*, that the hearing on the exception to the claim was set for February 14, 2014, that Jefferson and her counsel did not request a continuance and did not appear at the hearing, that the Executor alleged that Jefferson's claim was not a just debt of the Estate, and that no proof of the claim was presented. The Trial Court held a hearing on the Special Master's report and then entered an order on February 27, 2014 dismissing Jefferson's claim against the Estate.

On March 17, 2014, Jefferson filed a motion to set aside the denial of her claim alleging, with regard to the hearing before the Special Master, that Jefferson had just gotten out of the hospital, that road conditions were hazardous and Jefferson's attorney had fallen on ice injuring his knee and back, and that the severe inclement weather was beyond Jefferson's control. The Trial Court entered an order on March 18, 2014 setting aside the dismissal, reinstating Jefferson's claim, and then *sua sponte* recusing the trial judge.

On March 20, 2014, the Executor filed a Motion to Set Aside Order seeking to have the Trial Court's March 18, 2014 order set aside and the dismissal of Jefferson's claim reinstated. The Honorable Thomas J. Wright was designated to hear the case by interchange. On April 17, 2014 the Executor again filed his Motion to Set Aside Order seeking to reinstate the dismissal of Jefferson's claim.

The case proceeded to trial in November of 2014. Ruth Barker testified that she prepared Deceased's tax returns from 1998 through 2012. Ms. Barker testified that she is a senior buyer for Salisbury University, a self-employed tax preparer, and that she also works for Hamilton & Long Tax Service in Rogersville, Tennessee. Ms. Barker lives in Maryland, but still does work in Rogersville. She stated that she "come[s] down and dedicate[s] one week" to work in Rogersville doing tax preparation.

Ms. Barker met Deceased in 1997 or 1998 at the VFW in Rogersville, Tennessee. Ms. Barker admitted that she dated Deceased for approximately six months prior to beginning to prepare his tax returns. Ms. Barker testified that she spoke with Deceased "almost weekly." When asked about the last time she spoke to Deceased, Ms. Barker stated that she "talked to him the week before he passed away. He had asked me to come down here and see him, and I had actually made plans to do so, but he passed away the following week."

Ms. Barker never did accounting work for Jefferson, but she did meet Jefferson through Deceased at some time prior to 2006. Ms. Barker testified that Deceased claimed Jefferson on his taxes. She stated that he originally started claiming Jefferson in 2008.

When asked if she had handled any other types of financial matters for Deceased, Ms. Barker stated:

> [Deceased] would call me about his investments. We would go over - - when I prepared his income tax return, it would take several days to do. We had to go over every investment. In 19 - - we would - - when interest rates dropped, I advised [Deceased] perhaps he would like to move his money into investments. Of course, he was concerned about losing some of his principal because he had lost his retirement from the mining company, Conan & Company, when the stock market went under.

Ms. Barker testified that she assisted Deceased in moving his money from one account to another. She stated: "when the interest rates dropped way low, we moved - - I suggested to him that he put his money into money markets and bonds that would not take any of his principal because [Deceased] never wanted to lose one red cent of his money that he had worked for, and you can't blame him for that either."

Ms. Barker testified that Deceased had spoken to her about purchasing real property, and Ms. Barker advised Deceased to take the loan from Jefferson rather than take money from his investments. Ms. Barker testified that she knew Deceased had taken the loan from Jefferson because Deceased told her he did, but Ms. Barker was not present when the Note was signed and was not a party to the transaction.

Ms. Barker testified that as of the last year that she prepared his tax return, Deceased had not repaid the loan from Jefferson. When asked how she knew this Ms. Barker stated: "Well, [Deceased] and I would go over every investment that he had, and he never withdrew any of the investment money that he had." Ms. Barker was asked how much money Deceased had in investments, and she stated: "I would say at the time of his death it was probably somewhere in the neighborhood of four hundred thousand dollars ($400,000.00)."

Ms. Barker testified that she was familiar with Deceased's signature and could "[a]bsolutely" identify it because she had witnessed him signing documents "[m]any times." Ms. Barker identified the signature on the Note as Deceased's.

As pertinent, under the Will Deceased bequeathed the checking account known as the D.B. Trent account to Jefferson. The Executor testified that neither Deceased nor

Jefferson ever told him about the fifty thousand dollar loan. The Executor gave Jefferson an Affidavit ("the Affidavit") to sign, which stated: "I, the undersigned, a beneficiary of the Estate of Dennie Lamar Trent, do hereby make Affidavit that I have received my share of the Estate and request that the estate be closed." Jefferson signed the Affidavit on September 18, 2013. The Executor testified that he was unaware of the existence of the Note when he took the Affidavit to Jefferson to sign.

Sandra Inman, Jefferson's sister, testified at trial. Ms. Inman lives in North Carolina. She met Deceased "in 1970-something when he was coming to North Carolina and dating [her sister]." Ms. Inman explained that Deceased and Jefferson dated and then broke up for a time and again began dating after the death of Jefferson's husband, Jerry. Ms. Inman was asked if she had contact with her sister after 2007, and she stated: "[e]very day."

Ms. Inman testified that she has held some of Jefferson's money for Jefferson and that she still had some of Jefferson's money at the time of trial. Ms. Inman testified that she had held $138,000 for Jefferson, which was the money from the sale of Jefferson's house. Initially, this money was in a bank in North Carolina, and then Jefferson withdrew it from the bank and put it in Ms. Inman's safe. Ms. Inman was asked why Jefferson withdrew the money from a bank and put it into Ms. Inman's safe, and Ms. Inman testified: "She asked me to keep the money because she said she felt that she was being done in. . . . That she was being took advantage of. . . . By [Deceased]."

Ms. Inman was present when Deceased executed the Note on July 7, 2007. The Note was executed at the house where Jefferson and Deceased were living. Ms. Inman signed the Note as a witness. Ms. Inman's younger sister Rita Taylor also was present the day the Note was executed, and Ms. Taylor also signed the Note as a witness. Ms. Inman explained that Jefferson called and told Ms. Inman to bring fifty thousand dollars of the money Ms. Inman was holding for Jefferson to Jefferson's house, and Ms. Inman did as Jefferson requested. Ms. Inman testified that she obtained a blank pre-printed note from Walmart. Jefferson filled out the Note. Ms. Inman counted out the fifty thousand dollars and gave Jefferson the money to give to Deceased. Ms. Inman testified that she saw Deceased and Jefferson sign the Note.

Ms. Inman signed the Note on the back side instead of at the bottom of the front of the document. When asked why she signed the back of the Note, Ms. Inman stated:

> Well, I thought doing my - - I'm a layperson, and I thought that over here where it says - - where the Notary Republican (sic) - - I just wrote 'witness' and I witnessed it because I felt myself that if we wrote it right here where

they'd said Notary should be that it would take - - it would look better, I reckon. I don't know.

Deborah Jones who lives in Rogersville, Tennessee testified that she met Jefferson through Deceased. Ms. Jones testified that she had known Deceased for approximately twenty years. Deceased and Ms. Jones's husband were friends.

Ms. Jones testified that Deceased told her that he was going to borrow fifty thousand dollars from Jefferson to purchase land "[b]ecause he didn't want to get any of his stocks. He would lose money." She testified that Deceased told her this six or seven years ago during the summertime. Deceased never told Ms. Jones that he paid Jefferson back.

Jefferson testified that she has lived on Campbell Drive in Rogersville, Tennessee since 2003. She testified that she lived part-time at Deceased's home on Valley View Drive in Rogersville, Tennessee until Deceased's death on September 6, 2013. Jefferson testified that she met Deceased "a long time ago" in North Carolina and that he was her first love. Jefferson testified that Deceased had been working for a construction company, and when he left North Carolina Jefferson followed him to Tennessee and discovered that Deceased had a wife who was expecting a child. Jefferson then met and married her husband. Jefferson testified that she and Deceased continued to have some sort of relationship, and after her husband died Jefferson and Deceased "started running around together and then we started living together . . . about the middle of 2003."

Jefferson testified that she loaned Deceased the $50,000 to purchase land that adjoined land he already owned and that Deceased never paid her back. Jefferson explained that the real property was in Tennessee, but the seller was in North Carolina. Jefferson testified that she did not sign the Note, but that she did fill in the blanks. Jefferson was asked if the first written request for repayment of the loan was the claim she made against the Estate, and she admitted that she had not written Deceased anything prior to his death with regard to the loan. She stated: "No. I badgered him to death when he first got sick trying to get him to get me my money, . . . and his nephew said that he told him that he ought to do it."

Jefferson testified that at one point her house was put into Deceased's name "because he carried me on his income tax." She stated that she went along with it "to help him," and then the property later was transferred back to her. When asked why she gave Deceased the deed to her property, Jefferson stated:

> Because he was going to carry me on his income tax, and he said he had to
> do that in order to show that he was keeping me up six months out of the

year, And [sic] by it being in his name, it showed he was furnishing me a place to live.

Jefferson was asked if she ever was compensated by Deceased for her property and she stated: "Lord, no. . . . I paid [Deceased's] light and water bills. . . . And his groceries." When asked what would have happened if Deceased had died before deeding the property back to her, Jefferson testified that she retained a lifetime estate in the deed to Deceased.

Jefferson was asked about a check Deceased wrote to her the year that he died for eighteen thousand dollars. Jefferson stated:

He owed me twelve thousand (12,000), plus he owed me the fifty (50), but in his personal checking account I had money in it too, and I was under the impression I only had twelve thousand (12,000) in it. But he said that, no, it was eighteen thousand (18,000), . . . and that he would take care of the other, but he died.

Jefferson was asked about the Affidavit she signed stating that she had received her share of the Estate, and she stated:

I may not be too smart, but, now, [the Executor] said, quote unquote, I said, "What's that say"? He said, "That's just to show that the DB Trent account is closed.". . . And I said, "I know it is," because I had given - - paid [the Executor] for a few nights for staying with his daddy because he had lost work, a hundred and forty dollars ($140.00) a night. And then I had bought special groceries and stuff. So it took it. And I was down to eighteen cents (18¢) in it, and I told [Deceased] to go close it.

Jefferson testified that she signed the Affidavit without reading it and stated "because I trust [the Executor]." Jefferson was asked if she could read and write, and she stated: "Not very well."

Annette Peavler, Deceased's sister, testified that Jefferson "told me that what [Deceased] owed her was settled, that she was satisfied." Ms. Peavler testified that this conversation occurred prior to Deceased's death at the house where Deceased and Jefferson lived. When asked for further details about the conversation, Ms. Peavler stated: "I said, 'Are you satisfied?' after she told me that, and she said, 'Yes, everything's been fixed.'" Ms. Peavler was asked what 'satisfied' meant, and she stated: "Well, whatever she thought that he owed her." When asked if she knew specifically about what Deceased owed Jefferson, Ms. Peavler stated: "I know that she had - - she told me she

6

had twelve thousand dollars ($12,000.00) in his bank account." When questioned further Ms. Peavler agreed that at the time of this conversation she was unaware of the existence of the Note and that all she and Jefferson were talking about was the $12,000 that Jefferson wanted back. Ms. Peavler testified that neither Jefferson nor Deceased ever told Ms. Peavler that Deceased owed Jefferson $50,000.

Stephen Wayne Peavler, Deceased's nephew, testified that he saw Deceased often during the last few months of Deceased's life and that he took Deceased to the doctor and to chemotherapy treatments. When asked if he had conversations with Deceased about debts that Deceased owed to Jefferson, Mr. Peavler stated:

> Yes. From what I know he had twelve thousand dollars ($12,000.00) of [Jefferson's] in a checking account that she couldn't get to or what have you, and she needed her money, and he needed to pay her and settle up on the twelve thousand dollars ($12,000.00). . . . For some reason, I can't say or point a finger exactly what it was. He wrote her a check for . . . eighteen thousand dollars ($18,000.00), and that was to give [Jefferson] the twelve thousand (12,000) back and a couple odd thousand for this, and that, and what have you.

Mr. Peavler testified that he never heard about the fifty thousand dollar loan until after Deceased's death.

After trial the Trial Court entered its order on January 6, 2015 finding and holding, *inter alia* that Jefferson's claim for the unpaid loan of $50,000.00 as evidenced by the Note was valid and was approved, and that Jefferson had failed to meet her burden with regard to the claim for the Harley Davidson motorcycle, which was denied. The Executor appealed to this Court. On March 4, 2015[1], the Trial Court entered an order stating, in pertinent part:

> The Motion filed by the Trent Estate came on to be heard on the 11th day of August, 2014, before the Honorable Thomas J. Wright, sitting by interchange. The Court, after review of the motion and hearing argument of counsel, was of the opinion the motion was not well taken and the Court denied the motion.

## Discussion

---

[1] Although this order was not filed until after trial, it shows that the Executor's Motion to Set Aside Order was heard by the judge sitting by interchange prior to trial.

Although not stated exactly as such, the Executor raises four issues on appeal: 1) whether the original trial judge erred in reinstating Jefferson's previously dismissed claim prior to recusing; 2) whether the Trial Court erred in reinstating Jefferson's claim pursuant to Tenn. R. Civ. P. 55.02 and Tenn. R. Civ. P. 60.02 when Jefferson failed to file objections to the Special Master's report; 3) whether the Trial Court erred in hearing testimony alleged to be in violation of the Dead Man's statute; and, 4) whether the Trial Court erred in finding that Jefferson's claim against the Estate under the Note is valid. Jefferson requests an award of attorney's fees on appeal.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first consider whether the original trial judge erred in reinstating Jefferson's previously dismissed claim and then recusing himself. We understand the original trial judge's desire to return the dispute to square one once he decided to recuse himself. Once a judge decides recusal is necessary, however, the trial judge should, absent extraordinary circumstances, do just that and recuse himself or herself without making any further decisions in the case.

We agree with the Executor that the original trial judge should have recused himself prior to reinstating Jefferson's claim. This error, however, was cured when the new judge sitting by interchange heard the Executor's motion to set aside the order reinstating Jefferson's claim and then denied that motion. The end result wound up being exactly as it would have been if the original judge had recused prior to reinstating Jefferson's claim and the judge sitting by interchange had heard Jefferson's motion and ruled in Jefferson's favor. The issue of whether reinstatement of Jefferson's claim was proper was heard by an impartial court. This issue is without merit.

We next consider whether the Trial Court erred in reinstating Jefferson's claim pursuant to Tenn. R. Civ. P. 55.02 and Tenn. R. Civ. P. 60.02 when Jefferson failed to file objections to the Special Master's report. As pertinent, Tenn. R. Civ. P. 55.02 provides that "[f]or good cause shown the court may set aside a judgment by default in accordance with Rule 60.02." Tenn. R. Civ. P. 55.02. We review a trial court's decision with regard to Tenn. R. Civ. P. 60.02 motions for abuse of discretion. *Ferguson v. Brown*, 291 S.W.3d 381, 386 (Tenn. Ct. App. 2008).

The Trial Court entered its order on the Special Master's report on February 27, 2014 dismissing Jefferson's claim for failure to prosecute. Jefferson then filed a motion seeking to set aside the default judgment. The Trial Court entered an order on March 18, 2014 setting aside the dismissal of Jefferson's claim and reinstating Jefferson's claim, among other things. The Executor argues in his brief on appeal that Jefferson's failure to file objections to the Special Master's report precluded her from filing a Rule 60.02 motion with regard to the Trial Court's order on the Special Master's report.

In support of his argument the Executor cites Tenn. Code Ann. § 27-1-113 and some cases which discuss this statute. In pertinent part, Tenn. Code Ann. § 27-1-113 provides:

> In all cases tried on the facts in a chancery court and afterwards brought for review to the court of appeals, . . . . Where there has been a concurrent finding of the master and chancellor, which under the principles now obtaining is binding on the appellate courts, the court of appeals shall not have the right to disturb such finding. . . .

Tenn. Code Ann. § 27-1-113 (2000). This Court has provided gloss of this statute in the case of *Hopkins v. First Tennessee Nat. Bank*, which is cited by the Executor, stating: "Facts found by a Master and concurred in by the Chancellor are unassailable on appeal on the 'preponderance of the evidence' test of T.C.A. § 27-303. On appeal such approved fact finding has the same weight as a jury verdict at law." *Hopkins v. First Tennessee Nat. Bank*, 560 S.W.2d 916, 917 (Tenn. Ct. App. 1977).

The Executor has missed the point. The Executor is not arguing against a decision wherein this Court attempted to change the findings of a master in which a chancellor concurred. Rather, what is at issue here is a decision in which the Trial Court, a chancery court, altered its own opinion prior to the opinion becoming final. Pursuant to Tenn. R. Civ. P. 59[2] a trial court has the right to do just that, even on its own initiative pursuant to Tenn. R. Civ. P. 59.05. As such, we find the Executor's argument unpersuasive.

The Executor also argues that because the Trial Court entered its March 18, 2014 order reinstating Jefferson's claim only one day after Jefferson filed her motion that the

---

[2] Our Supreme Court has explained "for thirty days after entry of a final judgment, motions for relief should be premised upon Rule 59." *Discover Bank v. Morgan*, 363 S.W.3d 479, 489 (Tenn. 2012). Jefferson filed her motion seeking to reinstate her claim less than thirty days after entry of the February 27, 2014 order dismissing her claim, and the February 27, 2014 order adjudicated all claims, rights, and liabilities of all of the parties. Our Supreme Court provided helpful guidance with regard to the proper rule upon which to base motions to set aside previous decisions in *Discover Bank*, 363 S.W.3d at 488-90.

Executor did not have time to respond to Jefferson's motion, which somehow eliminated the Executor's right to challenge the March 18, 2014 order. Any such error arising from the early entry of the order was cured, however, when the Executor had the opportunity to file his Motion to Set Aside Order and this motion was heard by the new judge sitting by interchange months later. Thus, the Executor did have the opportunity to respond to Jefferson's motion.

With regard to whether the Trial Court erred in reinstating Jefferson's claim pursuant to Tenn. R. Civ. P. 60.02, we note that "while the consideration of a motion to set aside a judgment by default requires the exercise of the trial court's sound discretion, the law favors the granting of the motion." *Patterson v. Suntrust Bank*, 328 S.W3d 505, 511 (Tenn. Ct. App. 2010). Given the record now before us, we find no abuse of discretion on the part of the Trial Court in setting aside the judgment dismissing Jefferson's claim.

We next consider whether the Trial Court erred in hearing testimony alleged to be in violation of the Dead Man's statute. The Dead Man's statute, Tenn. Code Ann. § 24-1-203, provides:

> **24-1-203. Transactions with decedent or ward – Dead man's statute. –** In actions or proceedings by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party. If a corporation is a party, this disqualification shall extend to its officers of every grade and its directors.

Tenn. Code Ann. § 24-1-203 (2000).

The Executor argues in his brief on appeal that the Trial Court erred in allowing Jefferson's testimony and cites to pages 137 and 138 of the transcript of the trial. A careful review of the record on appeal reveals that what was discussed on pages 137 and 138 of the transcript with regard to the objection under the Dead Man's statute was a paper Deceased gave to Jefferson in 2011 referring to the motorcycle and not the Note. Jefferson's testimony itself does not appear on either of these pages. A review of the surrounding pages in the transcript reveals that just prior to the objection under the Dead Man's statute being raised, Jefferson answered questions about checks written on a specific bank account which she and Deceased shared. With regard to these checks, on page 136 of the transcript, the Executor's attorney argued that "if there was a debt on the motorcycle, that he paid for it." No issues regarding the motorcycle, however, were raised on appeal. The Trial Court ruled in the Executor's favor with regard to Jefferson's

claim for the motorcycle. As such, the admission of Jefferson's testimony with regard to the motorcycle is immaterial to the issues raised in this appeal.

Furthermore, in his brief on appeal the Executor argues that the Trial Court erred in allowing Jefferson's testimony "regarding the Promissory Note and [Deceased's] signature . . . ." Even if it were error to admit such testimony and this testimony were not considered, such error would be harmless given the record as a whole. The Note speaks for itself and the signature on the Note was established as Deceased's signature by other evidence, specifically the testimony of Ms. Barker who prepared Deceased's tax returns for years, who testified that she was familiar with Deceased's signature, and who identified the signature on the Note as Deceased's signature. Additionally, evidence other than the testimony of Jefferson, including testimony from Ms. Barker, showed that Deceased had not repaid the loan evidenced by the Note.

The Executor also argues in his brief on appeal that the Trial Court erred in admitting Ms. Inman's testimony in violation of the Dead Man's statute. Ms. Inman, however, is not a party to this suit and judgment could not be rendered either for or against her. As such, the Dead Man's statute does not apply to Ms. Inman's testimony.

The Executor argues further in his brief on appeal that Ms. Inman "continues to be inextricably linked with Jefferson's financial matters," and, therefore, Ms. Inman and Jefferson were involved in some sort of "familial joint venture," which should preclude Ms. Inman's testimony. The record before us on appeal, however, simply does not support this assertion. While Ms. Inman testified that she had held some money for her sister and that at the time of trial she was holding some money for Jefferson, which was intended to "[p]ut her away with at death," these facts alone are insufficient to prove a joint venture. The record contains nothing else which would support a finding that Ms. Inman and Jefferson were involved in some sort of "familial joint venture." Furthermore, a careful and thorough review of the record on appeal reveals that the objection under the Dead Man's statute was raised to Ms. Inman's testimony that Jefferson called and told Ms. Inman to bring money to Tennessee. The Trial Court held that this testimony did not concern a statement or transaction with Deceased and, therefore, did not violate the Dead Man's statute. We find no error in this ruling.

Next, we consider whether the Trial Court erred in finding that Jefferson's claim against the Estate under the Note is valid. The Executor raises several arguments with regard to this issue. First, the Executor argues on appeal that the Trial Court should have found an accord and satisfaction with regard to the loan. As this Court has explained:

> An accord and satisfaction is a type of contract and is governed by the law of contracts. *Cole v. Henderson*, 61 Tenn. App. 390, 413, 454

S.W.2d 374, 384 (1969).  In *Lytle v. Clopton*, 149 Tenn. 655, 663–664, 261 S.W. 664, 666–667 (1924), the Tennessee Supreme Court stated:

> An accord is an agreement whereby one of the parties undertakes to give or perform, and the other to accept in satisfaction of a claim, liquidated or in dispute, and arising either from contract or from tort, something other than or different from what he is or considers himself entitled to; and a satisfaction is the execution of such agreement.
>
> .....
>
> To constitute a valid accord and satisfaction it is also essential that what is given or agreed to be performed shall be offered as a satisfaction and extinction of the original demand; that the debtor shall intend it as a satisfaction of such obligation, and that such intention shall be made known to the creditor in some unmistakable manner.  It is equally essential that the creditor shall have accepted it with the intention that it should operate as a satisfaction.  Both the giving and the acceptance in satisfaction are essential elements, and if they be lacking there can be no accord and satisfaction. The intention of the parties, which is of course controlling, must be determined from all the circumstances attending the transaction.

(quoting 1 C.J. *Accord and Satisfaction* §§ 1 and 16 (1914)).  When a debtor clearly indicates that a check is offered upon a condition of satisfaction of a debt, the creditor's endorsement and collection on the check generally operate as an accord and satisfaction.  *E.g., Cole v. Henderson*, 61 Tenn. App. 390, 454 S.W.2d 374 (1969), and *Continental Insurance Co. v. Weinstein*, 37 Tenn. App. 596, 267 S.W.2d 521 (1953).

The party asserting the affirmative defense of accord and satisfaction has the burden of proving the defense by a preponderance of the evidence. *Rhea v. Marko Construction Co.*, 652 S.W.2d 332, 335 (Tenn.1983) and *Inland Equipment Co. v. Tennessee Foundry & Machine Co.*, 192 Tenn. 548, 552, 241 S.W.2d 564, 565 (1951).

*R.J. Betterton Mgmt. Servs., Inc. v. Whittemore*, 733 S.W.2d 880, 882 (Tenn. Ct. App. 1987).

The record on appeal shows that Jefferson was questioned about several checks that Deceased wrote to her prior to executing the Note. When an objection was raised as to relevance, the Executor's attorney asserted that this evidence was being introduced to show that Deceased "paid his debts to [Jefferson]." The evidence, however, does not show that these checks were written in payment for the Note, which was not in existence at the time some of the checks were written. Jefferson testified that some of the checks she was questioned about were written to her out of the account that she and Deceased shared because the money in that account was her money. As for the checks which were written after the Note was executed, the evidence does not show that they were intended by Jefferson and Deceased as an accord and satisfaction. There is no evidence that Deceased intended these checks as a satisfaction of the $50,000 loan and no evidence that such an intention was made known to Jefferson.

The evidence also shows that at one point Deceased owed Jefferson $12,000, or held this amount of money for her, that Jefferson requested it back, and that Deceased eventually gave Jefferson $18,000. Jefferson testified that she was under the impression that she only had $12,000 in the account, but that Deceased "said that, no, it was eighteen thousand . . . ." Mr. Peavler, Deceased's nephew, testified that he was aware of the $12,000 that Deceased owed to Jefferson and that Deceased "wrote [Jefferson] a check for . . . eighteen thousand dollars ($18,000.00), and that was to give [Jefferson] the twelve thousand (12,000) back and a couple odd thousand for this, and that, and what have you." There is no evidence that Deceased intended the $18,000 as a satisfaction of the $50,000 loan and no evidence that such an intention was made known to Jefferson. Given all of the above, the evidence in the record on appeal does not preponderate against the Trial Court's implicit finding that there was no accord and satisfaction.

The Executor also argues in his brief on appeal that because Jefferson signed the Affidavit, which states: "I, the undersigned, a beneficiary of the Estate of Dennie Lamar Trent, do hereby make Affidavit that I have received my share of the Estate and request that the estate be closed," that Jefferson was admitting that she no longer had any outstanding claims against the Estate. The evidence in the record on appeal shows that under the Will Jefferson was to receive the D.B. Trent account and that at the time she signed the Affidavit Jefferson acknowledged that she had indeed received the money in that account. The plain and unambiguous language of the Affidavit specifically states that Jefferson had "received [her] share of the Estate . . . ." The Affidavit does not state anything with regard to any potential claims against the Estate. It merely refers to Jefferson's "share of the Estate," language which clearly refers to the bequest left to Jefferson under the Will.

In his brief on appeal, the Executor quotes *Quality Care Nursing Servs., Inc. v.*

*Coleman*, 728 S.W.2d 1, 4 (Tenn. 1987) wherein it states: "If a written instrument stating an intention to discharge a debt is properly accepted by a creditor, the debt is then discharged whether it is disputed or not." In the case now before us, however, there is no written instrument stating an intention to discharge the $50,000 loan debt. In fact, the evidence shows that at the time that Jefferson executed the Affidavit she understood that the Affidavit concerned only the D.B. Trent account. Furthermore, the Executor testified that at the time he gave Jefferson the Affidavit to execute he was unaware even of the existence of the Note. As such, the Affidavit could not have been intended by the parties as a discharge of the $50,000 loan debt.

The Executor also argues that the Trial Court erred in finding the Note valid because the statute of limitations should bar Jefferson's claim. As pertinent to this issue, the Note states: "pay upon request" and does not state any time for payment. "A promise or order is 'payable on demand' if it (i) states that it is payable on demand or at sight, or otherwise indicates that it is payable at the will of the holder, or (ii) does not state any time of payment." Tenn. Code Ann. 47-3-108(a) (2001). Thus, the Note is payable on demand. The statute of limitations for a note payable on demand is contained in Tenn. Code Ann. § 47-3-118, which provides:

> Except as provided in subsection (d) or (e), if demand for payment is made to the maker of a note payable on demand, an action to enforce the obligation of a party to pay the note must be commenced within six (6) years after the demand. If no demand for payment is made to the maker, an action to enforce the note is barred if neither principal nor interest on the note has been paid for a continuous period of ten (10) years.

Tenn. Code Ann. § 47-3-118(b) (2001).

The evidence in the record on appeal does not show that Jefferson made a demand, or request, for payment of the loan until she filed her claim against the Estate. As no demand for payment was made, the applicable statute of limitations for an action on the Note would be ten years. The Note was executed in 2007. As such, the statute of limitations would not bar Jefferson's claim filed in 2013.

The Executor also argues that the Trial Court erred in allowing Ms. Barker to testify about Deceased's signature after Ms. Barker stated that she was not a handwriting expert. The Executor, however, has cited no law which requires that a signature must be identified by a handwriting expert, and in fact, our research discloses the contrary. *See State v. Williams*, 690 S.W.2d 517, 524 (Tenn. 1985) (holding no error in allowing testimony of lay witness as to signature); *Allen v. State*, 22 Tenn. 367, 368 (1842) (stating: "All that the rule of law contended for requires is that a witness who is called to

14

prove handwriting shall be able to show that he has had such means of knowledge as to furnish a reasonable presumption that he is qualified to form an opinion on the subject."). Ms. Barker testified that she was familiar with Deceased's signature and could "[a]bsolutely" identify it because she had witnessed him signing documents "[m]any times." Ms. Barker identified the signature on the Note as Deceased's.

We find and hold that the evidence does not preponderate against the Trial Court's findings and decision that Jefferson's claim against the Estate under the Note is valid. We therefore, affirm the Trial Court's January 6, 2015 order.

Finally, we consider Jefferson's request for an award of attorney's fees on appeal. In *Cracker Barrel Old Country Store, Inc. v. Epperson*, our Supreme Court explained:

> Tennessee, like most jurisdictions, adheres to the "American rule" for award of attorney fees. *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998); *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985). Under the American rule, a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case. *Taylor [v. Fezell]*, 158 S.W.3d [352] at 359 [ (Tenn. 2005) ]; *John Kohl*, 977 S.W.2d at 534.

*Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009) (footnote omitted).

As pertinent to this issue, the Note provides: "If Lender prevails in a lawsuit to collect on this note, Borrower agrees to pay Lender's attorney fees in an amount the court finds to be just and reasonable." As we have affirmed the Trial Court's holding that Jefferson's claim under the Note is valid, and a contractual provision in the Note creates a right to recover attorney fees in this case, we award Jefferson her attorney's fees on appeal. We remand this case to the Trial Court to determine the appropriate amount of an award of attorney's fees on appeal.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for the determination of an appropriate amount of an award to Jefferson of her attorney's fees on appeal and for collection of the costs below. The costs on appeal are assessed against the appellant, Barry Trent, Executor of the Estate of Dennie Lamar Trent, and his surety.

_____
D. MICHAEL SWINEY, CHIEF JUDGE